UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X-------------------------------------------------------------X

ANTHONY STALLWORTH, PARICHAY
BARMAN, NOOR TANI and the NEW YORK
TAXI WORKERS ALLIANCE, individually and
on behalf of all others similarly situated,

                                         Plaintiffs,

              -Against-

MEERA JOSHI, CHRIS WILSON, STAS
SKARBO, AND THE CITY OF NEW YORK,

                       Defendants.

X-------------------------------------------------------------X

__-CV-__ (___)

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiffs Anthony Stallworth, Parichay Barman, Noor Tani and the New York Taxi

Workers Alliance, individually and on behalf of all others similarly situated, by their

attorney Daniel L. Ackman as and for their complaint, allege as follows:

### NATURE OF THE ACTION

       1.      The City of New York, acting through its Taxi and Limousine Commission

(TLC), as a matter of policy and practice summarily suspends the taxi driver's license of any taxi

or for-hire vehicle driver who is arrested on any felony charge or any of 18 misdemeanor

charges.

       2.      As has been found by Hon. Richard J. Sullivan in *Nnebe v Daus*, 06-CV-4991

(RJS),  the TLC suspends drivers without prior notice or opportunity to be heard and without any

inquiry concerning the substance of the allegations supporting the arrest.

3.      The TLC then holds a "summary suspension hearing" ostensibly to review the suspension and to determine whether or not the suspension should continue while the criminal charges are pending. In fact, the review is fictional, and the TLC invariably continues these suspensions, lifting them only when the criminal charge incident to the arrest is resolved in the driver's favor. (If the criminal charge leads to a conviction at trial or by plea, the TLC reserves the right to revoke the taxi driver's license.)

4.      The summary suspension hearings are a sham. The hearings are held before an administrative law judge (ALJ), who cannot rule but whose authority is limited to issuing a "recommendation" to the TLC chair, who makes the final decision for the agency. Though the enacted regulatory standard permits suspensions only on a finding that the driver's continued licensure presents a direct and substantial threat to public health or safety—and though TLC lawyers have assured the Second Circuit Court of Appeals and have testified under oath that an arrest is not *per se* evidence that a suspension should be continued—the TLC, at post suspension hearings, relies solely on the fact of arrest as the grounds for continuing the suspension. Indeed, apart from evidence of the arrest and that the arrest charge remains pending, the TLC prosecutor adds only a rote legal argument that there is some "nexus" between the charge and public safety. All other factors—including whether the alleged offense is off duty and does not involve any passenger, the facts and circumstances of the alleged crime, the driver's work record, the absence of any prior criminal record, and the driver's personal hardship—are systemically ignored.

5.      In sum, even when extending the suspension, the TLC makes no effort to demonstrate that the driver poses a direct or substantial threat to public safety.

6.      The ALJs almost always permit the fact of arrest to be sufficient grounds to recommend continuing the suspension. The TLC chair always accepts such recommendations.

But in the comparatively rare cases where the ALJ recommends lifting the suspension, the TLC chair invariably rejects the recommendation. Either way, the suspension continues, and the hearing process *never* results in a suspension being lifted.

7. Defendants persist in enforcing their *de facto* policy even though the TLC is well aware that the vast majority of drivers suspended on arrest are ultimately reinstated after their criminal cases are resolved, albeit after months of being unnecessarily deprived of their livelihoods. Indeed, the TLC has recently admitted that in a recent five-year period, it issued 6669 suspensions on arrest, but knows of just 15 TLC licensees who had their licenses revoked due to a criminal conviction.

8. This policy impacts a taxi driver population that is more than 95% first generation immigrant, all of who work as (non-unionized) independent contractors and who are not protected by civil service laws.

9. To the extent the City and the TLC now admits that their policy is to suspend and continue suspension based on an arrest-plus-nexus standard and without regard to facts that might suggest a threat to public safety, they have denied TLC drivers fair warning of the law.

10. Plaintiffs bring their claims pursuant to the United States Constitution, as amended, the Civil Rights Act of 1871, 42 U.S.C. § 1983, the New York State Constitution, and New York State law. They seek redress, including injunctive relief and damages, for defendants' deprivation, under color of state law, of their rights, privileges, and immunities secured by the Constitution and laws of the United States and by the New York State Constitution. As the TLC's practice has no basis in state or city law, and indeed violates city law, plaintiffs seek redress under that law as well.

## JURISDICTION AND VENUE

11.     This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and under the New York State Constitution, Article 1, § 12.

12.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367, 2201.

13.     The acts complained of occurred in part the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b). The Taxi and Limousine Commission maintains its headquarters in the Southern District of New York.

## JURY DEMAND

14.     Plaintiffs demand trial by jury in this action.

## PARTIES

15.     Plaintiff Anthony Stallworth has been a New York City Taxi Driver since 2012. The TLC suspended his license on or around August 3, 2017, and his taxi driver's license remains suspended. He is a resident of Bronx County.

16.     Plaintiff Parichay Barman has been a New York City Taxi Driver since 1997. The TLC suspended his license on or around January 13, 2017. He is a resident of Queens County.

17.     Plaintiff Noor Tani has been a New York City Taxi Driver since __. The TLC suspended his license on or around April 7, 2017. He is a resident of Queens County.

18.     Plaintiff the New York Taxi Workers Alliance is a membership organization devoted to preserving the rights of taxi drivers and improving working conditions for taxi drivers in New York City. Among other activities, it aids and represents taxi drivers facing charges in

TLC courts. It has been harmed by being forced to expend scarce resources to defend individual members in TLC hearings, thus diverting resources from more broad-based efforts to improve working conditions in the taxi and limousine industry

19.     Defendant Meera Joshi is chairperson of the Taxi and Limousine Commission. She has overall responsibility for enforcing TLC policy. He is responsible for implementing and overseeing the policies of the commission and for ensuring that TLC personnel obey the Constitution and laws of the United States and of the State of New York.

20.     Defendant Chris Wilson is a deputy commissioner and general counsel of the TLC. Among other duties, Wilson rules on suspensions as the TLC chair's "delegate."

21.     Defendant Stas Skarbo is the TLC prosecutor, who orders suspensions on arrest and who appears for the TLC at post-suspension hearings.

22.     Defendant City of New York is a municipality of the state of New York, which includes the TLC as an administrative agency.

23.     The TLC is a non-mayoral agency, meaning it is insulated by the City Charter from direct mayoral control. The TLC is a nine-member commission, with one member acting as a chairperson, who also has executive responsibilities.  It is empowered by the Charter to act by a majority vote of its members. In addition to the City Charter, the TLC is governed by the Administrative Code of the City of New York, enacted by the City Council, and by the TLC rules, enacted by majority vote of the full TLC.

## CLASS ACTION ALLEGATIONS

24.     The plaintiff class seeks a (i) declaration that the TLC policy of summarily suspending licenses is unconstitutional; (ii) an order enjoining defendants from suspending licenses prior to affording taxi drivers proper and meaningful hearings on the

merits; (iii) an order mandating that unlawfully revoked or suspended licenses be reinstated; and (iv) compensatory and punitive damages.

25.     Plaintiffs sue on behalf of themselves and all other similarly situated individuals who the TLC has suspended based on an arrest pursuant to Rule 23 (a), Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. They seek to represent two subclasses. The first subclass is comprised of all drivers suspended on arrest whose suspensions are still ongoing. This subclass is seeking injunctive relief. The second subclass is comprised of all drivers suspended on arrest whose suspensions have since ended.

26.     The class period commences, due to tolling, on the date three years prior to the date of the complaint in *Nnebe v. Daus* and extends to the date on which the defendants are enjoined from, or otherwise cease, enforcing their unconstitutional policies and practices.

27.     The members of the class and each subclass are so numerous as to render joinder impracticable. Upon information and belief, based on TLC public records, there are more than 100 drivers whose licenses have been suspended prior to hearings on the merits. In addition, there are more than 100,000 taxi and for-hire vehicle drivers licensed by the TLC, all of whom are subject to the TLC's license suspension and revocation policies.   The vast majority of New York City taxi drivers are foreign born, most from countries with no tradition of civil rights.

28.     Upon information and belief, joinder is impracticable given the number of absent class members and because many members of the class are low-income persons, many of whom do not speak English well and likely would have great difficulty in pursuing their rights individually.

29.     The questions of law and fact common to the class and both subclasses include whether the class members have common rights under the Fifth and Fourteenth Amendments to be free from unconstitutional license suspensions.

30.     The named plaintiffs are adequate representative of the class. The violations of law alleged by plaintiffs stem from the same course of conduct by defendants, which violated and continue to violate the rights of members of the class; the legal theory under which the named plaintiffs seek relief is the same or similar to that on which the class will rely. In addition, the harm suffered by the named plaintiffs is typical of the harm suffered by absent class members.

31.     The named plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Counsel for the plaintiffs knows of no conflicts among members of the class.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of hundreds or thousands of separate actions would be inefficient and wasteful of legal resources; (b) the members of the class may be scattered throughout New York City and State and are not likely to be able to vindicate and enforce their constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against defendants which would establish incompatible standards of conduct for defendants; (f) defendants have acted and

will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate; and (g) questions of law and/or fact common to members of the class especially on issues of liability predominate over any question, such as that of individual damages, that affect individual members.

**FACTS**

TLC Suspension Policy:

33.     In order to work as a taxi or for-hire vehicle driver in the City of New York, an individual must possess a valid TLC driver's license.

34.     The TLC maintains a policy by which it summarily suspends the license of any taxi driver who is arrested on any of 18 misdemeanor or violations charges or on any felony charge.

35.     Such suspensions are ordered by letter from a TLC employee, generally Skarbo, in advance of any hearing.

36.     The TLC lawyer who orders the hearing knows of the fact of the arrest, but never inquires or learns anything about the allegations supporting the arrest.

37.     The TLC maintains this automatic-suspension-upon-arrest policy regardless of whether the arrest was in any way related to the taxi driver's work as a taxi driver.

38.     The TLC purports to justify this automatic-suspension-upon-arrest policy by reference to TLC Rule 68-15, which the TLC claims is based on New York City Admin. Code § 19-512.1.

39.     New York City Admin. Code § 19-512.1 refers to summary suspensions based on a finding of good cause by the Commission that the taxi driver represents a threat to public health or safety.

40.     No provision of the New York City Administrative Code requires the suspension of a taxi driver upon his arrest.

41.     Rule 68-15, enacted in 2014, provides for summary suspensions "if the Chairperson believes that continued licensure would constitute a direct and substantial threat to public health or safety." Subsection (d) allows for a suspension based on arrest "if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety." It includes a list of arrest charges for which the TLC might suspend. That list includes "any … felony" and 18 separate misdemeanors and violations. The rule adds, however, that the TLC is "not limited" by the list.

42.     Subsection (d)(3) allows for a "Summary Suspension hearing" where "the issue will be whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety."

43.     Summary suspension hearings are presided over by Office of Administrative Trials and Hearings (OATH) ALJs.

44.     Several OATH ALJs have themselves stated their views that the summary suspension hearings, with practices cabined by the TLC chair, deny drivers a meaningful hearing.

45.     The hearing lead to a "recommendation as to continuation of the suspension" by the ALJ and next to a "final determination" by the TLC chair.

46.     While subsection 68-15(b) states that the respondent "can request a hearing … within 10 calendar days" of his suspension and that the hearing is "to be held within 10 calendar

days of the receipt of the request," there is no time limit on how long a summary suspension may last prior to the chair's determination.

47.     In actual practice, even if a hearing is scheduled, the TLC makes no investigation or inquiry about the facts and circumstances leading to the arrest, and does not review or consider the drivers' record and makes no finding of any kind in deciding to continue the summary suspension. Specifically, it does not call the arresting officer, the assistant district attorney assigned to the case, any of the witnesses to the alleged crime, or the driver himself.

48.     TLC Rule 68-15 purports to permit summary suspensions based on a belief of the TLC Chair that the taxi driver represents a threat to public health or safety. But in actual practice, the TLC Chair has no belief or awareness of any kind.

49.     The "summary" suspensions continue not until the hearing process starts, but until it ends, which may take many weeks, not days.

50.     At the hearings, the TLC practice is to submit a document attesting to the fact of the arrest and to rely on that document for its entire case. The TLC submits no testimony or other evidence of the alleged crime.

51.     Contrary to the City Administrative Procedure Act, which requires the agency to sustain the burden of proof in adjudications, the TLC imposes on itself no burden of proof or burden of production of evidence in determining whether to continue the summary suspension.

52.     In fact, city ALJs regularly accept the statements of TLC lawyers as sufficient proof at such hearings and do not require TLC lawyers to present evidence or testimony in support of allegations that supposedly have led to the summary suspension.

53.     Although the suspended driver is invited and expected to testify, neither the TLC lawyer nor the TLC judge informs him (even if he is appearing *pro se*) of his right to remain

silent or the possible peril of testifying when criminal charges are pending. Though there is a hearing in form, it is meaningless and does not comport with the constitutional guaranty of due process.

54.     In a large majority of cases, the city ALJ has recommended that the suspension be continued.

55.     In every case where the ALJ has recommended the suspension be continued, the TLC chair (or the TLC general counsel, acting as the chair's delegate) has accepted that recommendation.

56.     In the cases where the ALJ has recommended the suspension be lifted, the TLC chair (or the TLC general counsel, acting as the chair's delegate) has rejected that recommendation. Thus, the hearing process has never led to discontinuation of a driver's arrest-based suspension.

57.     In that hearing process, TLC has followed a consistent practice on chair review of considering only identity, the fact of arrest, and the offense alleged—and of not considering evidence that the particular driver would not pose a direct and substantial threat to public health or safety.

58.     Nor will the TLC consider the circumstances underlying the arrest or even the factual allegations of the complaint.

59.     TLC policy is to presume the driver is guilty of the arrest charges.

60.     Thus, the chair does not consider evidence that the driver might be innocent of the charges or that the particular driver would not pose a direct and substantial threat to public health or safety.

61. Once the TLC was satisfied that criminal charges were still pending and that there is a "nexus" between the charges and public health or safety, the inquiry was over and any other facts or arguments are deemed irrelevant.

62. In assessing whether the driver's licensure *pendent lite* posed a threat to public safety, the TLC would not, in actual fact, consider whether it was the driver's first arrest, whether the arresting officer issued a Desk Appearance Ticket (DAT) instead of detaining the driver before arraignment, whether the arrest was for off-duty conduct or whether the driver was likely to be found not guilty.

63. Neither TLC rules not City statutes give drivers fair notice of the agency's *de facto* practice.

64. Guidelines published on the OATH website affirmatively mislead drivers by saying they can present evidence and tell their side of the story at hearings.

65. The TLC hearing process is highly inaccurate in identifying drivers who pose a genuine threat.

66. In recent years, the vast majority of drivers have forgone their opportunity to request a hearing for one of several sound reasons. First, it is well known in the taxi industry that drivers suspended on arrest have practically no chance of reinstatement through the hearing process. Second, if they do request a hearing, the driver will necessarily testify, potentially making sworn statements that could be used against him. Third, OATH ALJs have themselves advised drivers that they have no chance of prevailing in the hearing process. Fourth, if a hearing leads to a written recommendation, that document is published on the OATH website, making the driver's arrest a public record.

67. As a result, in the five-year period between 2012 and 2016, just 17 drivers had post-suspension hearings.

68. Ultimately, more than 75% of suspended drivers have their suspension lifted. None are reinstated through the hearing process or by ALJ order. They are reinstated only after a favorable disposition of the arrest charges.

69. In reinstating the driver, "The TLC does not consider why the charge is no longer pending – all that matters is that the driver is no longer charged with an offense on the list."

70. In an April 13, 2017 response to a FOIL request, the TLC stated that "From January 1, 2012 to January 1, 2017 there were 6669 TLC-licensees who were suspended due to an arrest" and that "15 TLC-licensees had their license revoked due to a criminal conviction." Thus, in this time period, suspension ripened into revocations just 0.2% of the time.

71. In sum, the vast majority of drivers subjected to the policy have had their licenses reinstated—albeit after months without being able to earn a living—reflecting the TLC's judgment that their working as a driver posed no substantial threat to the public after all.

### The Plaintiffs' Suspensions

**Anthony Stallworth:**

72. Stallworth, 49, obtained his TLC license in 2012 after a career in finance and in security and began driving a yellow taxi full time.

73. As Stallworth would later testify at his OATH hearing, he was involved in an incident on West 23rd Street and 7th Avenue July 19, 2017 in which a bicyclist rode into the a door of his taxicab, which had been opened by his passenger, an elderly woman named Marie Claude Vosse.

13

74.     Stallworth stayed at the scene, attending to his passenger and called 911. Meanwhile the cyclist became belligerent towards Stallworth, cursing at him and apparently ready for a fight.

75.     Soon, an ambulance arrived at the scene, followed by a police car. The police officer exchanged a few words with the ambulance driver and then told Stallworth that the side on the street where the incident occurred was not in his jurisdiction and that another officer would arrive soon.

76.     After attending to the cyclist, the ambulance pulled away, the cyclist leaving without telling Stallworth his name or contact information.

77.     At that point, Stallworth called 911 a second time to update the operator that the ambulance and a police officer had come and gone.

78.     About 10 minutes later, another police car drove by and Stallworth learned from the officer that he was in the 13th Precinct.

79.     About hour had passed at this point, and Stallworth called the precinct, which said that they would send an officer. After waiting further for an officer who did not arrive, Stallworth re-engaged his taximeter and returned to work.

80.     All told, Stallworth waited at the scene for over an hour, spoke to two police officers and an ambulance driver, and made three telephone calls to the police during that time.

81.     Stallworth's testimony was corroborated by his phone records and his trip records, indicating how long he stayed at the scene.

82.     Two weeks later, on August 3, Stallworth learned from his taxi base agent that a police officer had tried to contact him.

83.     Stallworth called the officer, who asked him to come to the 13th Precinct, which Stallworth did.

84.     After he arrived, the officer placed Stallworth briefly under arrest but soon issued a Desk Appearance Ticket and released him. The Desk Appearance Ticket commanded his presence at the New York County Criminal Court on October 3. He was released without being asked to post bail of any kind.

85.     As is customary with desk appearance tickets, Stallworth's case was not assigned at the time to an assistant district attorney (or, if it was, the ADA's name was not given to Stallworth).

86.     Stallworth has not yet had a court date in criminal court.

87.     The TLC, without any further inquiry, suspended Stallworth, announcing that suspension in a letter to him dated August 4, 2017.

88.     Stallworth requested a hearing, which occurred on August 18, 2017.

89.     At that hearing, the TLC prosecutor introduced two documents before resting his case. One document showed that Stallworth was a TLC licensee. The other showed that Stallworth had been arrested. Consistent with his practice, the TLC prosecutor offered no evidence about Stallworth's prior record, his position in the community, or his work record.

90.     After the ALJ denied his motion to dismiss the petition, Stallworth testified on his own behalf.

91.     He related the circumstances that led to his arrest, stated that he had no criminal record, that he had previously been employed and licensed as a security officer, and that he had been employed by Citigroup's global banking division before that. He added that he had never harmed or threatened a passenger and had never been accused of harming or threatening a

passenger. He testified also that he had passed multiple drug tests (and never failed a test) both as a security officer and as a taxi driver.

92.     Stallworth learned of his suspension not through any written notice by the TLC but through an inquiry to his base after he was unable to log in to his taximeter.

93.     Stallworth owns his own taxicab and leases his medallion. His car payments and medallion lease payments are ongoing even as his license remains suspended and he cannot work.

94.     Stallworth's inability to work while his obligations persist caused him substantial hardship to the point where he could not pay his electric bill and had to apply for public assistance.

95.     Stallworth requested a hearing, which was held on August 18, 2017.

96.     Prior to the hearing, consistent with its practice, the TLC made no inquiry into the facts and circumstances that led to the arrest. Specifically, it did not call the arresting officer, the assistant district attorney assigned to the case, any of the witnesses to the alleged crime, or Stallworth himself.

97.     At the hearing, the TLC prosecutor insisted: "Any inquiry as to underlying facts of the arrest is not really relevant. I know that the respondent's case here was mostly about what actually happened and whether or not he's a dangerous driver. That is not the relevant inquiry here."

98.     The TLC prosecutor argued as well that the standard for determining whether the suspension should be continued was determined not by city law, not by what city lawyers told the Second Circuit, and not by reference to the Second Circuit's decision in *Nnebe,* but by the district court's 2016 decision in that case.

99.     He added:

> The only thing that is relevant … is what, what the TLC seems to prove whether the driver is a licensee, whether they were charged with an—whether they were charged with an offense that TLC considers to be da- dangerous, dangerous to the public if, if true and whether the charges, whether the charges are still pending. **No one is accusing respondent of being a dangerous individual.** What we are saying is that, is that it's a pending charge in and of itself.
>
>                          * * *
>
> This, for better or worse, this is the standard. This is all that we need to prove. And with it, **any inquiry as, as to the fact is not relevant**…. (emphasis added).

100.    The OATH ALJ has yet to issue a recommendation on whether Stallworth's license should remain suspended. Thus, by default it remains suspended.

101.    In the five year period between 2012 and 2016 not a single taxi driver had his license revoked based on a criminal conviction for leaving the scene of an accident.

**Parichay Barman:**

102.    Barman, 52, has been a NYC taxi driver for approximately 12 years.

103.    Until the arrest that led to his suspension, he had never been arrested. He has never been convicted of any crime.

104.    He has never harmed or threatened to harm any taxi passenger.

105.    With his earnings as a taxi driver, Barman is the sole source of support for himself, his wife, and two children.

106.    On or about November 5, 2016, Barman was involved in an accident at LaGuardia Airport.

107.    On or around January 11, 2017, more than two months after the accident, Barman learned from his base agent that a police officer had called looking to speak to him.

108.     Barman called the officer, who asked him to come to the 115th Precinct, which Barman did.

109.     After a brief discussion, the officer arrested Barman, issued a Desk Appearance Ticket, and released him without requiring bail of any kind.

110.     The DAT ordered Barman to appear in Queens criminal court on March 31, 2017.

111.     Based on the arrest, without any further inquiry, the TLC suspended Barman's license on January 13, 2017, though Barman did not receive a letter informing him of his arrest until January 19.

112.     On February 6, 2017, Barman went to Queens criminal court with retained counsel in an attempt to move his first appearance in criminal court to an earlier date. Mr. Barman's first appearance was moved up to March 3.

113.     Barman requested a hearing on his suspension, which was held on February 10, 2017.

114.     Prior to the hearing, consistent with its practice, the TLC made no inquiry into the facts and circumstances that led to the arrest. Specifically, it did not call the arresting officer, the assistant district attorney assigned to the case, any of the witnesses to the alleged crime, or Barman.

115.     At that hearing, the TLC prosecutor introduced two documents, one showing that Barman is a TLC licensee, the other showing that he'd been arrested for leaving the scene of an accident, and rested his case.

116.     After his motion to dismiss was denied, Barman testified as to his arrest, his lack of criminal record, the fact that he had never been accused of harming or threatening to harm a passenger and his effort to accelerate his criminal court date.

117.     The TLC prosecutor did not ask a single question on cross-examination.

118.     Barman then called Shabbir Dalal, a friend of roughly 20 years as a character witness.

119.     Dalal testified that Barman is a gentleman, whom he had never seen strike or threaten anyone. Dalal added that he regularly trusts his own children with Barman and that he considered Barman a man of good character.

120.     Again, the TLC prosecutor asked no questions.

121.     In his closing statement, the TLC prosecution insisted that the regulatory standard as stated in the TLC rule and as described by TLC lawyers in the Second Circuit was actually not in effect. He said: "What the opposing counsel is stating is that we need to prove that the driver is dangerous, that the driver pose a substantial threat. That is not the standard. The standard is whether the charge, if it is true, has a sufficient nexus with public health and safety."

122.     Thus, according to the TLC prosecutor, all the TLC needed to prove "is that we have a licensee who was, who was charged, who, who was charged with a violation that has a sufficient nexus with public health and safety, that that char-, and that that charge is still pending."

123.     On February 21, 2017, the OATH ALJ issued a recommendation to the TLC chair that Barman's suspension continue. The decision noted the conflict between the regulatory standard propounded by the TLC at the hearing and what it had informed the Second Circuit was the standard. But it did not resolve the conflict, except implicitly when it allowed the TLC to

continue the suspension and to do so though it had relied solely on "documentary evidence," that is documents proving that the respondent held a TLC license and that he had been arrested.

124. The TLC chair, acting through "delegate" Chris Wilson, accepted the ALJ recommendation in a form letter dated March 14. Thus Barman remained suspended without a resolution of his hearing for 50 days.

125. On or around June 20, 2017, Barman pleaded guilty to a reduced charge of disorderly conduct, a non-criminal violation.

126. Soon after, the TLC reinstated his license, again without any inquiry as to the facts and circumstances that led to his arrest.

127. Barman's suspension lasted approximately 160 days.

**Noor Tani:**

128. Tani, 44, has been a licensed NYC taxi driver since 2014.

129. He has never been convicted of any crime and has not been accused of any act of violence though he has one prior arrest, which occurred in 1998 and as to which the charges were dismissed.

130. He has never harmed or threatened to harm any taxi passenger.

131. He has no serious TLC rule violations on his record.

132. With his earnings as a taxi driver, Barman is the sole source of support for himself, his wife, and six children.

133. As he testified at his OATH hearing, on or around March 14, 2016, Tani's taxi became stuck in the snow. In the course of trying to move it, he urged those around him to avoid contact with the cab. But as he backed up, a woman walking behind him fell and apparently claimed to have been hit by the cab.

134. At that point, Tani borrowed a chair from a shish-kebab vendor so the woman could sit. He also obtained a bag of ice that she could put on her leg.

135. About 25 or 30 minutes later, an ambulance arrived. Tani spoke to the attendant, who told him that the woman was OK and that he could leave. All told, Tani remained at the scene for 30-40 minutes.

136. On or around April 6, 2017, nearly two months after the incident, Tani learned from his base agent that a police officer wanted to talk to him.

137. Tani went to the police station, where the officer arrested him on the charge of leaving the scene of an accident, issued his a Desk Appearance Ticket, and released him. Tani was not required to post bail of any kind.

138. The TLC suspended his license by letter dated April 7, 2017.

139. The DAT ordered Tani to appear in Midtown Community Court on June 5, 2017, two months after his arrest.

140. Tani requested a hearing, which was held on May 3, 2017.

141. Prior to the hearing, consistent with its practice, the TLC made no inquiry into the facts and circumstances that led to the arrest. Specifically, it did not call the arresting officer, the assistant district attorney assigned to the case, any of the witnesses to the alleged crime, or Tani himself.

142. At the hearing, Tani testified about the facts and circumstances of the incident that led to his arrest, his family responsibilities, his absence of a criminal record, and his good TLC record. The TLC prosecutor did not ask a single question on cross-examination.

143. Tani then called a character witness, Daniel Vasquez, with whom he shares his taxi, and whom he sees twice every day.

144.     Vasquez described Tani as hard working, honest and very caring, as a very quite person whom he had never seen angry, and as a good father to his children.

145.     Tani also offered a letter from Gotham Yellow Company, 9, attesting that he is a driver in good standing, which was admitted into evidence.

146.     The TLC prosecutor offered a one-paragraph closing argument in which he stated, "As Rule [68-15(d)] states, the charges are all that really matter here."

147.     The OATH ALJ issued a decision to the TLC Chair on May 15, 2017, recommending that Tani's suspension be continued. The recommended decision stated that since it was "uncontested that respondent was issued a desk appearance ticket for the charge at issue, that the charge is still pending," Tani "should remain suspended until the criminal charge is resolved." It added that language from the Second Circuit's decision a charge itself "was insufficient to prove that respondent would continue to be a threat to public safety" was "dicta and not binding." The recommendation intimates, however, that the district court's decision is controlling.

148.     The TLC chair, acting through her "delegate" Chris Wilson, accepted the ALJ recommendation in a form letter dated May 31. Thus Tani remained suspended without a resolution of his hearing for 54 days.

149.     Ultimately, on or around June 27, 2017, Tani pleaded guilty to a reduced charge of disorderly conduct, a non-criminal violation, and the TLC reinstated his license.

150.     Tani's suspension lasted approximately 81 days.

### FIRST CLAIM FOR RELIEF / 42 U.S.C. § 1983 – DUE PROCESS – SUSPENSIONS WITHOUT HEARINGS

151.     Plaintiffs repeat and re-allege paragraphs 1 through 150 as if the same were fully set forth at length herein.

152.     By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which taxi and for-hire vehicle drivers may have their licenses summarily suspended based on unproven allegations, in the absence of evidence, and without a hearing, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

153.     All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof) and failed to prevent one another from doing so.

154.     Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' constitutional rights.

### SECOND CLAIM FOR RELIEF /42 U.S.C. § 1983 – DUE PROCESS – SHAM HEARINGS

155.     Plaintiffs repeat and re-allege paragraphs 1 through 154 as if the same were fully set forth at length herein.

156.     By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which taxi and for-hire vehicle drivers may have their licenses suspended based on unproven allegations, in the absence of evidence, and without a

23

meaningful hearing, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983 and of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

157.     All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof) and failed to prevent one another from doing so.

158.     Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' constitutional rights.

### THIRD CLAIM FOR RELIEF /42 U.S.C. § 1983 – DUE PROCESS – SUSPENSIONS WITHOUT PROPER FINDINGS

159.     Plaintiffs repeat and re-allege paragraphs 1 through 158 as if the same were fully set forth at length herein.

160.     By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which taxi and for-hire vehicle drivers may have their licenses suspended based on unproven allegations, in the absence of evidence, and without any finding of good cause by the Commission, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983 and

of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

161.    All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof) and failed to prevent one another from doing so.

162.    Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' constitutional rights.

### FOURTH CLAIM FOR RELIEF / 42 U.S.C. § 1983 – INSUFFICIENT NOTICE

163.    Plaintiffs repeat and re-allege paragraphs 1 through 162 as if the same were fully set forth at length herein.

164.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which taxi and for-hire vehicle drivers who were summarily suspended were given hearing notices that failed to indicate what claims and what evidence the ALJs and the TLC chair would consider in deciding whether to continue their suspensions, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983 and of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

165.	All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof) and failed to prevent one another from doing so.

166.	Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' constitutional rights.

### FIFTH CLAIM FOR RELIEF / 42 U.S.C. § 1983 – DENIAL OF FAIR WARNING OF THE LAW

167.	Plaintiffs repeat and re-allege paragraphs 1 through 166 as if the same were fully set forth at length herein.

168.	By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which former taxi drivers may have their licenses revoked without reasonably clear and published standards established by law, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of fair notice, due process of law, and the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983 and of rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

169.	Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' legal rights.

**SIXTH CLAIM FOR RELIEF/ New York State Constitution Art. 1, § 6**

170.    Plaintiffs repeat and re-allege paragraphs 1 through 169 as if the same were fully set forth at length herein.

171.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which taxi drivers may have their licenses summarily suspended without due process of law, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of rights, remedies, privileges, and immunities guaranteed to every citizen of the State of New York in violation of the New York State Constitution, Article 1, § 6. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof) and failed to prevent one another from doing so.

172.    All defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their rights secured by the New York State Constitution, Article 1, §6. Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' constitutional rights.

## IRREPARABLE HARM

173.    As to each of the foregoing claims, if defendants' policy, practice, and custom of summarily suspending taxi driver licenses based on mere allegations of wrongdoing is not enjoined, the named plaintiffs and the members of the plaintiff class will be subjected to immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fourth, Fifth, and

Fourteenth Amendments to the United States Constitution, Article 1, § 12 of the New York State Constitution and under state law.

## RELIEF REQUESTED

WHEREFORE, plaintiffs ask this Court:

A.      To enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b) for the plaintiffs' class and subclasses described herein and naming plaintiffs as the class representatives.

B.      To enter a judgment declaring that defendants' policy, practice, and custom of summarily suspending based on mere allegations of wrongdoing is unconstitutional.

C.      To enter a judgment declaring that defendants' policy, practice, and custom of summarily suspending based on mere allegations of wrongdoing is illegal under state law.

D.      To enter a judgment declaring that defendants' hearing procedures are unconstitutional and in violation of state law.

E.      To issue an order enjoining defendants' policy, practice, and custom of summarily suspending taxi driver licenses based on mere allegations of wrongdoing.

F.      To issue an order requiring defendants to reinstate the license of every taxi driver whose license has been suspended based on mere allegations of wrongdoing.

G.      To award the named plaintiffs and members of the class compensatory damages in an amount to be determined at trial.

H.      To award the named plaintiffs and members of the class punitive damages in an amount to be determined at trial.

I.      To award the named plaintiffs and members of the class reasonable attorneys'

fees and costs.

       J.      To grant such other and further relief as this Court shall find just and proper.

Dated: New York, New York
      September 18, 2017

/s/_____
Daniel L. Ackman
Law Office of Daniel L. Ackman
222 Broadway, 19th Floor
New York, NY 10038
Tel: (917) 282-8178
dan@danackmanlaw.com

*Attorney for Plaintiffs*