UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X----------------------------------------------------------------X

JONATHAN NNEBE, et al,

                                        Plaintiffs,

                                                          06-CV-4991 (RJS)
            -Against-

MATTHEW DAUS et al.,

                                        Defendants.

X----------------------------------------------------------------X
X----------------------------------------------------------------X

ANTHONY STALLWORTH, et al,

                                        Plaintiffs,

                                                          17-cv-7119 (RJS)
            -Against-

MEERA JOSHI , et al,

                                        Defendants.

X----------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Daniel L. Ackman
222 Broadway, 19th Floor
New York, NY 10038
Tel: 917-282-8178

David T. Goldberg
Donahue, Goldberg, Weaver &
Littleton
109 S. 5th Street, Suite 4201
Brooklyn, NY 11249
Tel: 212.334.8813

Shannon Liss-Riordan
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116
Tel: 617-994-5800


Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND.............................................................................................1

CLASS ACTION ALLEGATIONS ..................................................................................4

ARGUMENT.....................................................................................................................7

I.     A PLAINTIFF CLASS SHOULD BE CERTIFIED ............................................7

     A.  The Proposed Class Satisfies Rule 23(a) ................................................7

        1.  The Class is Sufficiently Numerous and
            Ascertainable – Rule 23(a)(1) ........................................................7

        2.  The Claims are Common Across Class
            Members – Rule 23(a)(2) ................................................................8

        3.  The Claims of the Proposed Class Representatives
            are Typical for the Class – Rule 23(a)(3) .........................................10

        4.  Adequacy of Representation – Rule 23(a)(4) ......................................11

           a.  The Named Plaintiffs Will Fairly and
              Adequately Protect the Interests of the Class ................................11

           b.  Proposed Class Counsel are Adequate ........................................12

     B.  The proposed class Satisfies Rule 23(b)(1)(A) ..........................................15

     C.  The Proposed Class Satisfies Rule 23(b)(2) ...............................................16

     D.  The Proposed Class Satisfies Rule 23(b)(3) ...............................................17

        1.  Common Legal and Factual Issues Predominate
            and Have Already Been Decided .......................................................17

        2.  A Class Action Is Superior to Other Methods
            of Adjudication ................................................................................18

II.    TH APPOINTMENT OF A SPECIAL MASTER
      CAN ASSIST WITH DETERMINING ANY CLASS
      DAMAGES ISSUES THAT MAY REQUIRE MORE
      IN-DEPTH ANALYSIS OR FACTFINDING .....................................................20

CONCLUSION..................................................................................................................22

## TABLE OF CASES

**Page(s)**

Amchem Products, Inc. v. Windsor, 521 U. S. 591 (1997)  ..............................................15

Amgen Inc. v. Conn. Ret. Plans & Trust Funds,
    133 S.Ct. 1184 (2013) ...................................................................9, 17

Bayshore Ford Truck Sales Inc. v. Ford Motor Co.,
    2015 WL 1639602 (3rd Cir. 2015)  ............................................21

Berry v. Baca, 226 F.R.D. 398 (C.D. Cal. 2005)  ............................................................15

Betances v. Fischer, 837 F.3d 162 (2d Cir. 2016)  .........................................................21

Betances v. Fischer, 304 F.R.D. 416 (S.D.N.Y. 2015)  ................................................9, 11

Brown v. Kelly, 609 F.3d 467 (2d Cir. 2010)  ...........................................................11, 19

Carey v. Piphus, 455 U.S. 246 (1978)  ............................................................................9

Cent. States Se. & Sw. Areas Health & Welfare Fund v.
    Merck–Medco Managed Care, LLC, 504 F.3d 229 (2d Cir. 2007)  ...........................7

Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)  ........................................................17

Comer v. Cisneros, 37 F.3d 775, 796 (2d Cir. 1994)  ......................................................16

Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473 (2d Cir. 1995)  ............................7

Daniels v. City of New York, 198 F.R.D. 409, 417 (S.D.N.Y. 2001)................................10

Gulino v. Bd. of Educ. of the City Sch. Dist. of N.Y.,
    2016 WL 4129111 (S.D.N.Y. 2016) ........................................20

Hirschfeld v. Stone, 193 F.R.D. 175 (S.D.N.Y. 2000) .....................................................12

In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242
    (2d Cir. 2011) ...................................................................11

In re Chevron U.S.A., Inc., 109 F.3d 1016 (5th Cir. 1997)  ............................................21

In re NASDAQ Mkt.-Makers Antitrust Litig., 169 F.R.D. 493
    (S.D.N.Y. 1996) ...............................................................12

In re Nassau County Strip Search Cases, 461 F.3d 219 (2d Cir. 2006) ...........................16

In re Nassau Cty. Strip Search Cases, 2008 WL 850268
(E.D.N.Y. Mar. 27, 2008) ......................................................................12

In re U.S. Foodservice Inc. Pricing Litig.,
729 F.3d 108 (2d Cir. 2013) ..................................................................16

In re Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124
(2d Cir. 2001) ...............................................................................18, 19

Johnson v. Nextel Commc'ns Inc., 780 F.3d 128 (2d Cir. 2015) ......................................17

Kerman v. City of New York, 374 F.3d 93, 135 (2d Cir. 2004).........................................9

Kline v. Wolf, 88 F.R.D. 696 (S.D.N.Y. 1981) ...............................................................11

Lapin v. Goldman Sachs & Co., 254 F.R.D. 168 (S.D.N.Y. 2008) ..................................10

Marisol A. v. Giuliani, 126 F.3d 372 (2d Cir. 1997) ...............................................8, 10, 11

Martins v. 3PD, Inc., 2013 WL 1320454, *8 (D. Mass. Mar. 28, 2013) .........................21

McDaniel v. City. of Schenectady, 2005 WL 1745566 (N.D.N.Y.
July 21, 2005) .......................................................................................12

Moeller v. Taco Bell Corp., 816 F.Supp.2d 831 (N.D. Cal. 2011) ..................................22

Moreno v. Deutsche Bank Americas Holding Corp., 2017 WL
3868803 (S.D.N.Y. Sept. 5, 2017) .......................................................12

Powell v. Ward, 540 F. Supp. 515(S.D.N.Y. 1983) ........................................................21

Premier Health Ctr., P.C. v. UnitedHealth Grp., No. CIV. 11-425 ES,
2014 WL 4271970 (D.N.J. Aug. 28, 2014) 3868803 ................................15

Ray M. v. Bd. of Educ., 884 F. Supp. 696 (E.D.N.Y. 1995) ...........................................10

Roach v. T.L. Cannon Corp., 778 F.3d 401 (2d Cir. 2015)........................................18, 20

Rodolico v. Unisys Corp., 199 F.R.D. 468 (E.D.N.Y. 2001) ..........................................19

Rodriguez v. It's Just Lunch, Int'l, 300 F.R.D. 125, 132 (S.D.N.Y. 2014) .......................8

Smith v. Wade, 461 U.S. 30 (1983) .............................................................................10

Spagnola v. Chubb Corp., 264 F.R.D. 76 (S.D.N.Y. 2010) ............................................12

Stinson v. City of New York, 282 F.R.D. 360 (S.D.N.Y. 2012) ..................................9, 19

Sykes v. Mel S. Harris & Associates LLC, 780 F.3d 70 (2d Cir. 2015)............................18

Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036 (2016) ...............................................16

United States v. Vulcan Society, Inc., 2013 U.S. Dist.
    LEXIS 66593 (E.D.N.Y. 2012) ...............................................................................20

Vincent v. Money Store, 304 F.R.D. 446 (S.D.N.Y. 2015) ...............................................10

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d
    288 (1st Cir. 2000) ...................................................................................................17

Wilson v. Kiewit Pac. Co., 2010 WL 5059522
    (N.D. Cal. Dec. 6, 2010) ..........................................................................................21

## PRELIMINARY STATEMENT

The Court of Appeals has determined that Defendants' post-suspension-on-arrest practices are unconstitutional. Plaintiffs now ask the Court to certify a plaintiff class made up all taxi or for-hire vehicle drivers whose licenses were suspended by the TLC based on the driver having been arrested on a criminal charge any time from June 28, 2003, until the present (or until Defendants have implemented a post-suspension hearing process that is ordered by the Court). All such class members are entitled to at least nominal damages, and a large majority of them are entitled to compensatory damages. Because all requirements of Rule 23 of the Federal Rules of Civil Procedure have been satisfied, and as suggested by the Second Circuit in its decision, the fairest and most efficient way to resolve this dispute and provide redress to drivers who have suffered from the City's long-running unconstitutional practices is to adjudicate and award relief on a class-wide basis.

## FACTUAL BACKGROUND

The factual and procedural history of these cases are detailed in the two decisions by the Court of Appeals as well as in the 2014 Findings of Fact (ECF # 323) in the *Nnebe* action. To summarize, at least from the beginning of the proposed class period, the City of New York, acting through its Taxi and Limousine Commission (TLC), routinely suspended the licenses of taxi drivers who were arrested on any felony charge or for a long list of misdemeanor charges. Findings 7. The TLC ordered these suspensions based on an arrest notice, not waiting for the resolution of the criminal case, without a hearing of any kind, without any investigation or consideration of the facts underlying the arrest, and without regard to the driver's record or history. *Nnebe v. Daus*, 931 F.3d 66, 72 (2d Cir. 2019). In recent months, the TLC has been

suspending 167 drivers per month or about 2,000 drivers per year based on arrests. Decl. of  M.

Akinlolu, ¶ 14, ECF # 455.

A city ordinance, NYC Code § 19-512.1 and  a TLC rule ( which has amended from time

to time and is now numbered Rule 68-15) permitted the summarily suspended driver to request

an evidentiary hearing "before an administrative tribunal of competent jurisdiction."  NYC Code

§ 19-512.1. The issue to be determined at that hearing was (and is) "whether the charges

underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while

awaiting a decision on the criminal charges would pose a direct and substantial threat to public

health or safety." *Id.* § 68-15(d)(3); Findings 8-9. Ostensibly, the hearing was to determine

whether or not the driver's suspension should be continued pending resolution of the arrest

charges. 931 F.3d at 71. Following the hearing, the hearing judge (currently an administrative

law judge employed by the City's Office of Administrative Trials and Hearings (OATH)) issued

a decision, in the form of a report and recommendation to the TLC chair, as to whether extending

the suspension was justified. *Id*. at 72-73. The chair was (and is) then empowered to "determine

whether to accept, modify, or reject the Recommendation" and was allowed up to 60 days to do

so. TLC Rule 68-15(c). While the ALJs at least sometimes considered facts particular to the

driver's licensure beyond the fact of arrest, the TLC chair never did. "Throughout the period at

issue, regardless of the affiliation of the ALJ, the Chair, like the TLC ALJs.… [did] not consider

the specific factual allegations in the complaint, nor does he or she consider any evidence that

the driver is not guilty of the charges, or any other evidence that a particular driver does not pose

a direct and substantial threat to public safety based on his or her individual characteristics or

history." 931 F.3d at 74. While there were some differences over time, the post-suspension

hearing process never resulted in the TLC Chair lifting a suspension, *id.*, prior to the Second Circuit's 2019 decision.

Over the years, "[D]rivers and their union representatives were being made aware in some manner of the standard being applied to facts by the ALJs and the TLC Chair that rendered the hearings futile." *Id*. at 89. Indeed, OATH's practice was to hold pre-hearing conferences where an ALJ would "discourage drivers from going forward with a hearing by informing the driver that there is 'little or no chance' that the driver will ultimately prevail." 931 F.3d at 73 n.7. Such advice led most drivers "to waive or postpone their hearing. Findings 11 n. 8. Thus, there were just a "few dozen hearings conducted between 2007 and 2014." Findings 11.

When a criminal charge was resolved in the driver's favor (meaning it was dismissed, reduced or adjourned in contemplation of dismissal), the TLC's practice has been to reinstate the driver, again without consideration of the circumstances of the arrest and without regard to the driver's record. 931 F.3d at 84. For decades, the overwhelming majority of suspended drivers were reinstated through resolution of the criminal charges rather than through a TLC hearing process. But the criminal justice system can be slow to process such cases, especially when (as is often true of suspended drivers) the defendant has been issued a desk appearance ticket and is not in custody. Thus, as the Second Circuit squarely held, some 75% to 90% of the drivers whose deprivations were protracted were individuals whose interim reinstatement *would not* have posed a direct and substantial safety threat. *Id*. at 84-85.[1] These lengthy and needless deprivations inflict immense hardship on drivers and their families.

On a joint appeal of both actions, the Second Circuit, citing the risk of error, the burden on individuals, and the absence of any safety (or other) justification for not providing hearings

---

[1] The real error rate might now be even higher. During a five-year period between 2012 and the end of 2016, during which time the TLC ordered 6,669 summary suspensions, "just 15 TLC-licensees [not 15%, 15 total] had their licenses revoked due to a criminal conviction." ECF # 454, Ex. 2.

that fairly and accurately determine whether a driver's interim licensure would directly endanger the public, held the City's practice unconstitutional. The Court further held that the pre-hearing notices to drivers whose licenses were summarily suspended on arrest did not provide drivers with sufficient information necessary to prepare meaningful objections or a meaningful defense and thus also denied drivers procedural due process.

Since the Court of Appeals ruled, hearings have remained rare, though the results of the few hearings that have occurred have changed significantly. Despite the TLC suspending 167 drivers per month between August 2019 and February 2020, there were just 18 summary suspension hearings (an average of three per month) during this time. Akinlolu Decl. ¶ 14.   In their reports since the Second Circuit ruled, however, ALJs have cited the decision and claim to follow it. They also have tended to rule in favor of the drivers: In 14 of the 19 hearings in which decisions have been made public through February, ALJs have recommended reinstatement. Decl. of D. Ackman, ECF # 454, Ex. 4. And TLC Chair (or her designee) has, for the first time in history, sustained an ALJ recommendations to reinstate; indeed, she has done so in all but one of the cases where the ALJ determined the a direct and substantial threat had not been demonstrated. The Chair has also accepted every recommendation *against* reinstatement. These results are in sharp contrast to prior outcomes. Before the Second Circuit's 2019 decision, the Chair never allowed reinstatement to occur, and ALJ's, operating in the shadow of the Chair's persistent rejections of recommendations to reinstate, advocated lifting a suspension only four times between 2014 and 2018. ECF # 454, Ex. 5.

## CLASS ACTION ALLEGATIONS

A. THE PROPOSED CLASS: The Court should certify a class of all TLC-licensed drivers whose licenses were suspended by the TLC based on the driver having been arrested on a criminal charge any time between June 28, 2003, until the present (or

until Defendants have implemented a post-suspension hearing process as ordered by the Court).

B. PROPOSED CLASS REPRESENTATIVES: The class should be represented by Jonathan Nnebe, Eduardo Avenaut, Khairul Amin, Anthony Stallworth, Parichay Barman and Noor Tani.

On behalf of the proposed plaintiff class, the Named Plaintiffs brought claims pursuant to 42 U.S.C. § 1983 in 2006 (the *Nnebe* plaintiffs) and 2017 (the *Stallworth* plaintiffs) challenging Defendants' violation of their Fourteenth Amendment rights as well as their rights under state law. The constitutional allegations were ultimately resolved in plaintiffs' favor by the Court of Appeals.

Each proposed class representative was, at the time of his suspension, a driver licensed by the TLC. The TLC suspended each of their licenses based on an arrest, served on them a constitutionally defective pre-hearing notice, and afforded them a post-suspension hearing process that denied them due process of law.[2]

**Jonathan Nnebe** became a licensed New York City taxi driver in 1992. His license was suspended by defendant TLC on May 30, 2006, based on arrest on a misdemeanor assault charge. After a perfunctory hearing on June 8, 2006, a TLC ALJ recommended that his suspension be continued and then-TLC Chair Matthew Daus accepted that recommendation. As a result, Mr. Nnebe's taxi license remained suspended for some four months.

**Eduardo Avenaut**, at the time a licensed New York City taxi driver, was suspended on July 20, 2006, based on an arrest on a misdemeanor assault charge. He did not request a hearing. The criminal charge was dismissed for failure to prosecute on or around October 24, 2006, at which point the TLC reinstated his license.

---

[2] The *Nnebe* plaintiffs previously move to certify a class, ECF # 47, but that motion was dismissed as moot when this Court dismissed the Complaint. ECF # 156.

**Khairul Amin**, at the time a licensed New York City taxi driver, was arrested on or about June 11, 2005, in the midst of a protracted dispute with his landlord and charged with misdemeanor offenses. The TLC suspended his license on or about June 14, 2005. Mr. Amin attended a summary suspension hearing, denied the charges, and explained the circumstances of his arrest. The TLC judge recommended and the TLC Chair ruled that his suspension should be continued. On or around August 24, 2005, he was offered an adjournment in contemplation of dismissal, which, on advice of counsel he accepted in order to be able to return to work, he accepted. On February 23, 2006, the charges were formally dismissed.

**Anthony Stallworth**, a licensed New York City Taxi Driver since 2012, was suspended on or around August 3, 2017, following his arrest on the charge of leaving the scene of an accident. Following a hearing, on September 26, 2017, an OATH ALJ recommended that Stallworth's taxi driver's license be reinstated. The TLC rejected the recommendation by a letter dated October 18, 2017, and signed by TLC General Counsel Christopher Wilson. The criminal charges were dismissed in December 2017 and the TLC reinstated his license.

**Parichay Barman** had been a New York City Taxi Driver since 1997 when the TLC suspended his license on or around January 13, 2017, based on an arrest on the charge of leaving the scene of an accident. Following a hearing, on February 21, 2017, an OATH ALJ issued a recommendation that Barman's suspension continue. Three weeks later, Wilson, acting for the chair, accepted that recommendation. On or around June 20, 2017, Barman pleaded guilty to a reduced charge of disorderly conduct, a non-criminal violation and the TLC reinstated his license.

**Noor Tani**, who had been a New York City Taxi Driver since 2014, was suspended on or around April 7, 2017, following an arrest for leaving the scene of an accident. Following a

hearing, on May 15, 2017, an OATH ALJ recommended that his suspension be continued. Two

weeks later, Wilson, acting for the Chair, accepted that recommendation. On or around June 27,

2017, Tani pleaded guilty to a reduced charge of disorderly conduct, a non-criminal violation,

and the TLC reinstated his license.

## ARGUMENT

### I.    A PLAINTIFF CLASS SHOULD BE CERTIFIED

Plaintiffs seek to certify the proposed class pursuant to Fed. R. Civ. P. 23(b)(1), 23(b)(2),

and 23(b)(3). The proposed class satisfies the prerequisites of Rule 23(a) in that: (1) membership

in the proposed class is readily ascertainable and numerous, in that the proposed class numbers in

the thousands; (2) claims are common across members of the proposed class; (3) the proposed

class representatives' claims are typical of members of the proposed class members; and (4)

plaintiffs' representation is adequate.  Further, the proposed class satisfies Rule 23(b)(1) in that

prosecuting separate actions by individual class members would create a risk of inconsistent or

varying adjudications with respect to individual class members that would establish incompatible

standards of conduct for Defendants. The proposed class also satisfies Rule 23(b)(2) in that

Defendants have acted and refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole. And the proposed class satisfies Rule 23(b)(3) in that questions of law or fact common to

the members of the proposed class predominate over any questions affecting only individual

members; and a class action is superior to other available methods for adjudication of the

controversy.

### A. The Proposed Class Satisfies Rule 23(a)

#### 1.   The Class is Sufficiently Numerous and Ascertainable – Rule 23(a)(1)

The proposed class clearly meets the numerosity requirement because the proposed class is so large that joinder of all individual class members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Rule 23(a)(1)'s "numerosity requirement … does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 504 F.3d 229, 244–45 (2d Cir. 2007). Where, as here, a case involves a class numbering in the thousands, the numerosity requirement of Rule 23(a)(1) is satisfied. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("numerosity is presumed at a level of 40 members").

Moreover, the class is easily ascertainable. For every driver whose license it suspends based on arrest, the TLC receives and creates multiple documents. It receives an arrest notice from the Division of Criminal Justice Services containing the driver's name, date of birth and address. The TLC then checks whether the arrestee is a TLC licensee and, if so, sends a suspension notice to the address on file with the agency (and may send an e-mail as well). If the driver requests a hearing, the TLC also sends a hearing notice. Following any hearing, the TLC receives from OATH a report and recommendation, after which it renders a decision for the agency signed by the chair or the general counsel. Findings 4. Thus, the TLC has multiple records by which can identify class members. In addition, the TLC has generated responses to FOIL requests stating the number of suspensions on arrest on an annual basis for each year from 2012 through 2016, ECF # 454, Exs. 1, 2, 11, and has stated a precise number of suspensions on

arrest between August 2019 and February 2020. Thus, TLC records indicate the identity of each proposed class member.

### 2. The Claims are Common Across Class Members – Rule 23(a)(2)

Commonality does not require that each class member have identical claims, only that they share at least one question of law or one fact. *Marisol A. v. Giuliani*, 126 F.3d 372, 376(2d Cir. 1997); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 132 (S.D.N.Y. 2014). A question of law or fact is common to the class if the question is capable of class-wide resolution. *See*, *e.g*., *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (internal citation omitted). In this case, every proposed class member has been summarily suspended on arrest, has been denied a constitutionally adequate pre-hearing notice, and has been denied a post-deprivation hearing consistent with due process of law. "Based on the very definition of the class, all putative class members have suffered injuries from the [City's] general policy" of denying suspended drivers a fair hearing. *See Betances v. Fischer*, 304 F.R.D. 416, 427 (S.D.N.Y. 2015). Thus, the proposed class members' claims turn on the answers to common questions of law and fact— indeed questions already resolved by the Court of Appeals. While the proponent of class certification need not show that the common "questions will be answered, on the merits, in favor of the class," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1191 (2013), the Court of Appeals has already determined that the City's practices for many years violated the Constitution.

Moreover, all class members are entitled to at least nominal damages for the proven constitutional violation they suffered. *Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Kerman v. City of New York*, 374 F.3d 93, 135 (2d Cir. 2004). Further, given that the vast majority of class members were ultimately reinstated when their criminal cases were resolved, these class members will also be entitled to lost pay damages and (at least) garden variety emotional distress

damages.3  The amount of lost income suffered by each proposed class member is easily known:

The TLC knows the duration of each driver's suspension, and in each case, their daily earnings

before and after their suspensions are known as well through electronic records maintained by

yellow taxis or by electronic receipts paid through Uber or other black car companies. Damages

for garden variety pain and suffering may also be addressed on a class basis. *See In re Nassau*

*Cty. Strip Search Cases*, 2008 WL 850268, at *6 (E.D.N.Y. Mar. 27, 2008) (extending

previously certified class to include issues of damages, which included general damages for loss

of human dignity). Whether plaintiffs are entitled to punitive damages is also a common issue.

*See Smith v. Wade*, 461 U.S. 30, 56 (1983) (punitive damages possible in § 1983 action "when

the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others").  The commonality

requirement is therefore satisfied because "the injuries complained of by the named plaintiffs

allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will

injure the proposed class members." *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y.

2001); *see also Marisol A.*, 126 F.3d at 376-77; *Ray M. v. Bd. of Educ.*, 884 F. Supp. 696, 699

(E.D.N.Y. 1995) (commonality requirement met where plaintiffs "are challenging a practice of

defendants," and not merely defendants' "conduct with respect to the individual plaintiff[s]").

---

3 Plaintiffs submit that the fact that class members whose licenses were ultimately reinstated
were by the TLC's own reckoning not a direct and substantial threat to the public. *See* 931 F.3d
at 85 ("the vast majority of the suspensions will turn out to have been, by the standard applied by
the TLC itself, erroneous"). To the extent there are individualized factual issues that need to be
resolved, these issues could be handled if necessary by a special master, as discussed further
*infra*.

### 3.  The Claims of the Proposed Class Representatives are Typical for the Class – Rule 23(a)(3)

Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "This requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010), citing *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted). Typicality does not require that the representative claims be identical to those of the class members, and minor factual variations among plaintiffs will not defeat certification. *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 175 (S.D.N.Y. 2008); *see also Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) ("[I]t is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification.") (citations omitted).

"The typicality requirement may be satisfied where 'injuries derive from a unitary course of conduct by a single system.'" *Betances v. Fischer*, 304 F.R.D. at 425; Marisol A., 126 F.3d at 377. The proposed class representatives' claims are typical because their claims arise from a uniform policy. *See Betances*, 304 F.R.D. at 425 (typicality satisfied where "injuries derive from a unitary course of conduct by a single system"). While there may be factual differences between the circumstances of each suspension, every proposed class member was denied an adequate hearing notice and all were denied the opportunity for a meaningful hearing. Meanwhile, the categories of damages available to the class representatives are typical of those of the entire proposed class, even if not every class member suffered the same amount of damages.

### 4.  Adequacy of Representation – Rule 23(a)(4)

Rule 23(a)(4) requires that movants demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Class counsel must also be qualified and experienced to conduct the litigation, pursuant to Fed. R. Civ. P. 23(g)(1).

### a.   The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The "[a]dequacy [requirement] is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (internal quotation marks and citation omitted). Class representatives are fiduciaries for the remainder of the class. *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981), aff'd 702 F.2d 400 (2d Cir.1983) (class representative serves as fiduciary to advance and protect interests of those whom he purports to represent). While courts should "carefully scrutinize the adequacy of representation in all class actions," they "do not require the representative plaintiff to be the best of all possible plaintiffs." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 95 (S.D.N.Y. 2010) (citations and quotation marks omitted). In order to determine if the class representative will discharge his or her fiduciary obligations faithfully, "a court must examine various factors such as credibility, reliability, and potential conflicts." *McDaniel v. City. of Schenectady*, 2005 WL 1745566, at *2 (N.D.N.Y. July 21, 2005).

Here, each of the named plaintiffs is an adequate representative of the proposed class because each was subject to the same unlawful conduct as other class members and suffered the same injuries that the action seeks to remedy. *See Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000). Additionally, there are no actual or potential conflicts of interest between the named plaintiffs and the proposed class as every victim of the suspension-on-arrest policy suffered the same principal harm. *See Moreno*, 2017 WL 3868803, at *7. To the extent that

differences regarding proof and amount of damages exist between class members, such differences do not give rise to a conflict. *See*, *e.g*., *In re NASDAQ Mkt.-Makers Antitrust Litig*., 169 F.R.D. 493, 513 (S.D.N.Y. 1996). Each of the named plaintiffs has testified when called. Plaintiffs Amin and Avenaut testified at trial. Nnebe appeared at trial to testify, but he was not called. Plaintiffs Stallworth, Barman and Tani all appeared for post-suspension hearings and testified under oath.

### b.  Proposed Class Counsel are Adequate

Meanwhile, Plaintiffs have retained counsel with extensive experience representing plaintiffs in Section 1983 cases and in class actions, as well as the unique experience of litigating against the TLC and in litigating the *Nnebe* action for 14 years, including at trial and on two successful appeals. These counsel have already achieved a determination that defendants' conduct was unconstitutional.

Daniel Ackman has successfully litigated against the City and the TLC on numerous occasions. In *Padberg v. McGrath-McKechnie*, Ackman won summary judgment on a due process claim against the City and TLC officials, 203 F. Supp. 2d 261, 267-68 (E.D.N.Y. 2002), after which a class was certified with Ackman as class counsel. In *Rothenberg v. Daus*, Ackman was sole counsel, prevailing on an appeal, 2012 WL 1970438 (2d Cir. 2012), and, with co-counsel, won partial summary judgment and a settlement on behalf of a plaintiff class.[4] In *Harrell v. City of N.Y.*,  Ackman and co-counsel won summary judgment declaring that the TLC's longstanding program of seizing cars allegedly being operated for-hire without a license was unconstitutional. 138 F. Supp. 3d 479 (S.D.N.Y. 2015). In *Raja v. Burns*, Ackman won summary judgment on behalf of a non-lawyer industry representative whose right to practice in

---

[4] While Ackman commenced the case on his own and was lead counsel throughout, for purposes of settlement, the City insisted that his co-counsel be named class counsel.

TLC-OATH court was summarily suspended. 19-CV-01328 (AMD) (RER) (E.D.N.Y. Mar. 11, 2019).

Shannon Liss-Riordan is a well-known and respected class action lawyer who has litigated employment class actions around the country, succeeding in many appeals, class trials, settlements, and mass arbitration cases. Each year since 2008, she has been selected for inclusion in *Best Lawyers in America* (Chambers), and her firm has consistently been ranked in recent years in the top tier for its practice area. Most recently, she has been known for representing Uber and Lyft drivers, as well as other "gig economy" workers, challenging their misclassification as independent contractors and resulting wage violations. She was appointed as class counsel to represent a class of 240,000 Uber drivers in California, *see O'Connor v. Uber Technologies, Inc.*, 2015 WL 5138097 (N.D. Cal., Sept. 1, 2015), 311 F.R.D. 547 (N.D. Cal. 2015). When that case was decertified on appeal, 904 F.3d 1087 (9th Cir. 2018), she obtained a substantial settlement for a portion of the class and proceeded to represent thousands of other drivers individually in arbitration.[5]

---

[5] Notable victories in class cases Ms. Liss-Riordan has obtained on appeal include *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 2019 WL 1945001 (9th Cir. May 2, 2019) (reversing summary judgment and articulating standard for independent contractor misclassification claims under California law); *Haitayan v. 7-Eleven, Inc.*, No. 18-55462 (9th Cir. 2019) (reversing summary judgment and denial of injunction); *Maplebear dba Instacart v. Busick*, No. A151677 26 Cal.App.5th 394 (2018) (affirming dismissal of attempt to vacate class certification in class arbitration); *Khanal v. San Francisco Hilton, Inc*., No. 15-15493 (9th Cir. 2017) (holding state Labor Code claims not preempted by LMRA); *Williams v. Jani–King*, 837 F.3d 314 (3d Cir. 2016) (affirming class certification in misclassification case); *Taylor v. Eastern Connection Operating, Inc*., 465 Mass. 191 (2013) (applying favorable state choice of law in class misclassification case); *Matamoros v. Starbucks Corp*., 699 F.3d 129 (1st Cir. 2012) (affirming class certification and summary judgment for plaintiff class in Tips Act case); *Awuah v. Coverall North America, Inc*., 460 Mass. 484 (2011) (defining recoverable damages in misclassification case); *Skirchak v. Dynamics Research Corporation*, 508 F.3d 49 (1st Cir. 2007) (holding class waiver in arbitration agreement unenforceable); *Cooney v. Compass Group Foodservice*, 69 Mass. App. Ct. 632 (2007) (establishing strict liability standard for Tips Act violations).

David T. Goldberg is a nationally recognized civil rights lawyer, with decades of experience litigating complex Section 1983 and public law cases at every level of the federal judicial system. In addition to serving as co-counsel in this case for more than a decade, he has been appellate counsel in numerous class and collective action cases, *see, e.g., In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305 (11th Cir. 1999), and co-counsel in important cases against the City of New York, including *Newton v. City of New York*, 779 F.3d 2015) (reinstating jury verdict in damages suit for procedural due process violation), and *Louima v. City of New York*, No., 98 CV-508 (SJ) (E.D.N.Y.), which concluded in a landmark monetary settlement with the City and the Patrolmen's Benevolent Association. Recognized as a "Super Lawyer" in the field of constitutional law for each of the past five years, Goldberg was Co-Founder and Co-Director of the Supreme Court Litigation Clinic at the University of Virginia School of Law and recently spent two years teaching Supreme Court and appellate litigation at Stanford Law School.

Counsel will continue to litigate in the best interests of the plaintiffs and the Proposed Class, and are therefore appropriate class counsel pursuant to Fed. R. Civ. P. 23(g)(1).

### B.  The Proposed Class Satisfies Rule 23(b)(1)(A)

Having satisfied the requirements of Rule 23(a), a class may be appropriately maintained if it satisfies any of the categories or sub-categories of Rule 23(b). Rule 23(b)(1)(A) applies where separate actions by or against individual class members would create a risk of "establish[ing] incompatible standards of conduct for the party opposing the class," such as "where the party is obliged by law to treat the members of the class alike," *Amchem Products, Inc. v. Windsor*, 521 U. S. 591, 614 (1997). "[T]he phrase 'incompatible standards of conduct' is deemed to refer to the situation in which different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." *Premier Health Ctr.,*

15

*P.C. v. UnitedHealth Grp.*, No. CIV. 11-425 ES, 2014 WL 4271970, at *27 (D.N.J. Aug. 28,

2014), reconsideration denied, No. CIV. 11-425 ES, 2014 WL 7073439 (D.N.J. Dec. 15, 2014)

(citing Wright, Miller & Kane § 1773); *Berry v. Baca*, 226 F.R.D. 398 (C.D. Cal. 2005).

Here, if there were separate actions by individual class members would such actions

could result in different and incompatible standards of conduct being imposed on the City and

the TLC create a risk of inconsistent or varying adjudications with respect to individual class

members that would establish incompatible standards of conduct for defendants. Different

rulings could require different forms of notice, different hearing standards and different rules

concerning chair review of ALJ decisions. Such a state of affairs would be harmful to

Defendants as well as class members. Because the City, as a municipal government, has a duty to

enforce the law fairly and consistently, a class should be certified here to avoid the possibility of

multiple, inconsistent adjudications that could establish inconsistent standards of conduct for

defendants. Indeed, here the Second Circuit has already issued a decision that effectively applies

to a class and the Court is considering the proper remedy to effectuate that decision.  Therefore,

class certification may also be granted under Rule 23(b)(1)(A).

### C.  The Proposed Class Satisfies Rule 23(b)(2)

There is no disputing that plaintiffs satisfy the requirement for certification under Rule

23(b)(2)—that defendants "ha[ve] acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief …is appropriate respecting the class as a whole." The TLC

has subjected every driver whose license has been summarily suspended on arrest to the same

post-suspension process that the Court of Appeals held unconstitutional. And that Court

contemplated that the remedy—including the new, "constitutionally adequate process," that this

Court "fashion[s]," *Nnebe v. Daus*, 931 F.3d at 88—would apply to *every* arrest-based license

suspension going forward. As the Second Circuit has repeatedly emphasized, Rule 23(b)(2) is

"satisfied [when] the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to [the defined class]." *Comer v. Cisneros,* 37 F.3d 775, 796 (2d Cir. 1994).

### D.  The Proposed Class Satisfies Rule 23(b)(3)

Class certification is also appropriate under Rule 23(b)(3) because common legal or factual issues predominate over individual issues and because a class action is superior to other methods of adjudication to resolve this dispute.

### 1.  Common Legal and Factual Issues Predominate and Have Already Been Decided

The primary question in certifying a Rule 23(b)(3) class is whether "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof" and whether "these particular issues are more substantial than the issues subject only to individualized proof." *Johnson v. Nextel Commc'ns Inc*., 780 F.3d 128, 139 (2d Cir. 2015), citing *In re U.S. Foodservice Inc. Pricing Litig*., 729 F.3d 108, 118 (2d Cir. 2013) (internal quotation marks omitted). The proposed class meets this standard. Individual class members would not "need to present evidence that varies from member to member," but would raise a "common question … where the same evidence will suffice for each member" to make his or her case. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045, (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)) (internal quotation marks omitted).

Common issues of law and fact predominate over any individualized issues that may exist in this case. The primary issue here—whether the TLC's post-suspension hearing process is unconstitutional—is common to the entire class and has already been decided in Plaintiffs' favor. "Even resolved questions continue to implicate the 'common nucleus of operative facts and

issues' with which the predominance inquiry is concerned." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006), citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299 (1st Cir. 2000). A judgment of liability can be entered against defendants vis-à-vis every single member of the class based solely on the City's uniform practices. Meanwhile, plaintiffs have used common proof to establish defendants' liability for the violations of individual class members' constitutional rights. The mere presence of individual questions will not defeat class certification. *See Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 81 (2d Cir. 2015), citing *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S.Ct. 1184, 1196 (2013).

With respect to damages, in order to establish predominance, Plaintiffs need only show that the damages of all class members are attributable to a uniform theory of liability. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015), citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013)). Plaintiffs seek to be made whole for their injuries that follow from the City's denial of adequate notice and a meaningful hearing are entitled to damages that flow from those injuries: lost income and emotional harm.[6] In any event, the possibility of individualized damages determinations does not preclude a finding of predominance. Nor do differences in the proof offered to quantify damages. *See Roach*, 778 F.3d at 408 ("[t]he Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving

---

[6] While all class members are entitled to at least nominal damages for having suffered a constitutional violation, perhaps the simplest and most conclusive way to determine which class members are entitled to compensatory damages is by reference to which suspended drivers were later reinstated. Through their reinstatement, the TLC itself determined that these drivers' licensure would not pose a direct and substantial threat to public safety. The amount of lost income in particular cases can be determined by calculating the amount of fares and tips the driver earned during the equivalent period just prior to or just after the driver's suspension, which is known by computerized trip records that have been maintained at least since 2009, and applying that rate to the period of the drivers' suspension. The amount of damages for drivers pre-2009 can be accurately estimated through trip records and TLC data on average driver earnings.

individualized damages calculations"); *In re Visa Check/Mastermoney Antitrust Litigation*, 280

F.3d 124, 139 ("Common issues may predominate when liability can be determined on a class-

wide basis, even when there are some individualized damage issues."). This case is ideally suited

for class certification because it concerns the systemic implementation of a uniform policy, and

issues concerning liability, as well as the bulk of individual damages, can be easily resolved

based on defendants' own records. Certification is appropriate since "it appears that virtually

every issue prior to damages is a common issue." *In re Visa Check*, 280 F.3d at 139.

### 2. A Class Action Is Superior to Other Methods of Adjudication

Plaintiffs easily meet the second prong of Rule 23(b)(3), which requires they demonstrate

that a class action is "superior to other available methods for fairly and efficiently adjudicating

the controversy." Rule 23(b)(3). "Class actions are the superior method for resolving

controversies when the main objectives of Rule 23 are served, namely the efficient resolution of

the claims or liabilities of many individuals in a single action, as well as the elimination of

repetitious litigation and possibly inconsistent adjudications." *Stinson*, 282 F.R.D. at 383

(quoting *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 479 (E.D.N.Y. 2001)). Certification of the

proposed class will permit the resolution of thousands of individual claims in a single forum,

thereby promoting judicial economy, avoiding a multiplicity of repetitive lawsuits and the

potential for inconsistent results. More importantly, "without class certification, it is likely that

the constitutional violations plaintiffs allege would go unadjudicated, as many of the potential

class members do not possess the knowledge or resources to prosecute a lawsuit, and the

relatively small amount of damages suffered by each individual plaintiff decreases the possibility

of individual lawsuits being filed." *Stinson*, 282 F.R.D. at 383, citing *Rios v. Marshall*, 100

F.R.D. 395, 409 (S.D.N.Y. 1983) ("[T]he relatively small amount likely in any individual

recovery . . . renders certification of a plaintiff class in this action particularly susceptible to

class-wide adjudication."). Here, plaintiffs allege and have demonstrated a set of unconstitutional practices, making class certification especially appropriate. *See Brown v. Kelly*, 609 F.3d 467, 484 ("[W]here plaintiffs were allegedly aggrieved by a single policy of the defendants, and there is strong commonality of the violation of the harm, this is precisely the type of situation for which the class action device is suited.") (citations omitted). As such, a class action represents a superior means of adjudicating plaintiffs' claims.

## II. THE APPOINTMENT OF A SPECIAL MASTER CAN ASSIST WITH DETERMINING ANY CLASS DAMAGES ISSUES THAT MAY REQUIRE MORE IN-DEPTH ANALYSIS OR FACTFINDING

As noted above, it is well established that individualized damages do not defeat class certification. *Roach*, 778 F.3d at 408. While the method for adjudicating damages need not be determined upon the certification of a class, plaintiffs note that the Court has at its disposal a number of options for adjudicating class damages, even if some individualized issues come into play. Plaintiffs submit that lost pay damages for class members may be readily calculated by consulting records regarding the duration of drivers' suspensions and their fares and tips before and after their suspensions. *See supra* at note 6. Likewise, garden variety emotional distress damages could be adjudicated through a common formula. Drivers who wish to make more particularized showings on damages (including, for example, drivers who incurred wasted costs or attorneys' fees on undergoing a futile hearing) could be given the option of making such a showing, through proof subject to rebuttal by the City.

The appointment of a special master could be useful to the Court if such individual hearings become necessary (or if the Court determines that categories of class members need to have their right to damages separately adjudicated). Judges in this district have repeatedly used masters to calculate and assess damages in actions where class-wide violations have been found. *See, e.g., Gulino v. Bd. of Educ. of the City Sch. Dist. of N.Y.,* 2016 WL 4129111, at *1

(S.D.N.Y. 2016) (using a special master for damages calculations following a class-wide determination on liability); *United States v. Vulcan Society, Inc.,* 2013 U.S. Dist. LEXIS 66593 at *4 (E.D.N.Y. 2012) ("As part of the remedial phase of this litigation, the Special Masters have issued a series of Reports & Recommendations ('R&Rs') as to the eligibility of individual claimants for priority hiring and monetary relief."); *Powell v. Ward,* 540 F. Supp. 515, 517 (S.D.N.Y. 1983) (appointing special master to decide damages for inmates whose disciplinary hearings were held to violate their due process rights). Likewise, in *Betances v. Fischer*, 837 F.3d 162, 165 (2d Cir. 2016), the Second Circuit found that the defendants violated inmates' due process rights by administratively imposing post-release supervision and remanded the issue of remedy to the district court. In two separate decisions on remand, the court indicated that a special master could be appointed to calculate individualized damages for class members, in addition to a calculation of class-wide damages. *See* 403 F. Supp. 3d 212, 217-18 (S.D.N.Y. 2019); 304 F.R.D. 416, 430-32 (S.D.N.Y. 2015); *see also Martins v. 3PD, Inc*., 2013 WL 1320454, *8, n. 3 (D. Mass. Mar. 28, 2013) (certifying class in wage case and referring to a magistrate the computation of damages); *Wilson v. Kiewit Pac. Co*., 2010 WL 5059522, *9 (N.D. Cal. Dec. 6, 2010) ("[W]hen the time comes for proof of damages … that process will be determined largely by defendant's documents and manageable through a number of potential methods, including review by a special master or submission of claims by employees subject to challenge or rebuttal by defendant").

Bellwether trials (again, presided over by a special master) are another method the Court could consider for adjudicating damages. Such trials "have long been included in the Manuel for Complex Litigation" on the theory that "[i]f a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by

providing information on the value of the cases as reflected by the jury verdicts." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997); *see also Bayshore Ford Truck Sales Inc. v. Ford Motor Co.*, 2015 WL 1639602, *2 (3rd Cir. 2015) (class members were bound by decision of district court in bellwether trials of eleven class members); *Moeller v. Taco Bell Corp.*, 816 F.Supp.2d 831, 835-36 (N.D. Cal. 2011). In short, to the extent there are substantial individual damage question, this Court has ample means of reconciling them.

## CONCLUSION

Because all of the proposed class members have been treated by defendants in the same unconstitutional manner, because the all have the same claims, because all have suffered damages, because common legal and factual issues predominate, and for all the reasons stated, this Court should certify a plaintiff class.

**DATED: July 17, 2020**
**New York, NY**

> **Respectfully submitted:**
>
> **/s/**_____
>
> Daniel L. Ackman
> Law Office of Daniel L. Ackman
> 222 Broadway, 19th Floor
> New York, NY 10038
> Tel: 917-282-8178
> d.ackman@comcast.net
>
> David T. Goldberg
> Donahue, Goldberg, Weaver & Littleton
> 109 S. 5th Street, Suite 4201
> Brooklyn, NY 11249
> Tel: 212.334.8813
> david@donahuegoldberg.com
>
> Shannon Liss-Riordan
> Lichten & Liss-Riordan, P.C.
> 729 Boylston Street, Suite 2000

Boston, Massachusetts 02116
Tel: 617-994-5800
sliss@llrlaw.com