UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JONATHAN NNEBE, *et al.*,<br><br>                                  Plaintiffs,<br><br>        -v-<br><br>MATTHEW DAUS, *et al.*,<br><br>                                  Defendants. | No. 06-cv-4991 (RJS) |
| ANTHONY STALLWORTH, *individually and on behalf of all others similarly situated, et al.*,<br><br>                                  Plaintiffs,<br><br>        -v-<br><br>MEERA JOSHI *et al.*,<br><br>                                  Defendants. | No. 17-cv-7119 (RJS)<br><br><br>OPINION & ORDER |

RICHARD J. SULLIVAN, Circuit Judge:

        This Opinion and Order marks the latest installment in a pair of long-running cases

involving the New York City Taxi and Limousine Commission (the "TLC") and licensed taxi

drivers who have been suspended after being charged with crimes.  In the first case, *Nnebe v. Daus*,

No. 06-cv-4991, Plaintiffs Jonathan Nnebe, Eduardo Avenaut, and Khairul Amin, together with

the New York Taxi Workers Alliance, brought a putative class action against Defendants Matthew

Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, the TLC, and the City of New York,

alleging that the TLC's policy of summarily suspending taxi drivers upon notification of their

arrest violates the United States Constitution, New York state law, and New York City municipal

law.  (Doc. No. 42.)[1]  In the second case, *Stallworth v. Joshi*, No. 17-cv-7119, Plaintiffs Anthony

Stallworth, Parichay Barman, Noor Tani, and the New York City Taxi Workers Alliance (together

with the *Nnebe* Plaintiffs, "Plaintiffs") commenced an action against Defendants Meera Joshi,

Chris Wilson, Stas Skarbo, and the City (together with the *Nnebe* Defendants, "Defendants"),

similarly alleging that the TLC's policy of summarily suspending a taxi driver's license upon arrest

for any felony charge or certain enumerated misdemeanor charges violates the United States

Constitution and New York state law.  (17-cv-7119, Doc. No. 1.)

Now before the Court is Plaintiffs' motion for (1) a preliminary injunction barring

Defendants from suspending drivers based on arrests during the COVID-19 pandemic or "unless

and until this Court has ordered a constitutionally adequate pre-hearing notice and directed the

implementation of a rule that will ensure a fair hearing process" (Doc. No. 453 at 4), and (2) a

permanent injunction mandating specific reforms to the TLC's post-suspension hearing process.

(Doc. No. 452; 17-cv-7119, Doc. No. 70.)[2]

For the reasons stated below, Plaintiffs' motion for a preliminary injunction is DENIED in

its entirety.  With respect to Plaintiffs' request for permanent injunctive relief, the Court agrees

with Plaintiffs that Defendants' revised procedures fail to ensure timely resolution of TLC license-

suspension proceedings; in all other respects, Plaintiffs' motion for a permanent injunction is

DENIED.

---

[1] Unless otherwise indicated, all docket citations are to 06-cv-4991.

[2] In resolving this motion, the Court has also considered Plaintiffs' brief in support of their motion (Doc. Nos. 453), Defendants' brief in opposition (Doc. No. 456), Plaintiffs' reply brief (Doc. No. 457), and an assortment of supplemental letter submissions that include, among other things, updated information about the number of drivers availing themselves of hearings, the average length of time for the TLC to process a suspension, and amended rules proposed and adopted by the TLC.  (Doc. Nos. 475–80.)

## I.    BACKGROUND

These cases concern the TLC's authority to issue, revoke, and suspend taxi drivers' licenses and the process that is due after such a suspension. Under § 19-512.1(a) of the New York City Administrative Code (the "Code"), the TLC may suspend a driver, "prior to giving notice and an opportunity for a hearing," "for good cause shown relating to a direct and substantial threat to the public health or safety." N.Y.C. Code § 19-512.1(a). That provision requires the TLC to notify drivers of a summary suspension within five days and to hold a hearing within ten days of a driver's request for a hearing, "unless the [TLC] . . . determines that such hearing would be prejudicial to an ongoing criminal or civil investigation." *Id.*

The TLC has implemented its § 19-512.1-summary-suspension powers through a summary-suspension rule (the "Rule"), which has been amended and renumbered several times. The current version – enacted in 2014 and effective through January 8, 2021, when a new Rule is scheduled to go into effect (Doc. No. 479 at 1) – states that "[t]he Chairperson can summarily suspend a License based upon an arrest or citation if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety." 35 R.C.N.Y. § 68-15(d)(1). The Rule lists all felonies and certain enumerated misdemeanors that will trigger a summary suspension, and provides that a hearing will determine "whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." *Id.* § 68-15(d)(3).

At all times relevant to this litigation, if a driver requested a hearing, the TLC scheduled it and notified the driver by letter of the hearing's time, date, and location. *Nnebe v. Daus*, No. 06-cv-4991 (RJS), 2014 WL 3891343, at *7 (S.D.N.Y. Aug. 8, 2014). At the hearing, the driver

3

and a TLC attorney were free to present evidence and argue before an administrative law judge ("ALJ"), who subsequently issued a non-binding recommendation to the TLC Chairperson (the "Chairperson" or "Chair") that the suspension either be continued or lifted.  *Id.*

Before November 2007, suspension hearings were held before ALJs employed by the TLC. *Id.*  At those hearings, the ALJs determined only (1) whether the suspended driver had been charged with a crime, (2) whether the charge was still pending, and (3) whether there was a "nexus" between the charged crime and public health or safety.  *Id.* at *8.  The ALJs would find a nexus between the charged crime and public health or safety if there was a rational basis to conclude that the continued licensure of a driver who had actually committed that crime would threaten public health or safety.  *Id.*  In other words, the ALJs considered whether the alleged crime, which was presumed to be true, demonstrated a risk to public safety, not whether that *particular* suspended driver would pose such a risk.  *Id.*  TLC ALJs did not tell drivers about the applicable standard, and in any event, nearly all TLC ALJs recommended that the suspensions be continued.  *Id.* at *8–9.

After November 2007, all hearings involving suspended drivers were conducted by ALJs employed by the City's Office of Administrative Trials and Hearings ("OATH").  *Id.* at *7.  Like their TLC counterparts, OATH ALJs assumed that the criminal charges were true.  *Id.* at *9.  But unlike TLC ALJs, OATH ALJs considered evidence beyond the charge to determine whether the particular suspended driver, in fact, posed a direct and substantial threat to public health or safety. *Id.*  Under this individualized standard, although the number of recommendations to lift a suspension remained low, drivers were more likely to receive a favorable recommendation.  *Id.*

After the ALJ made its recommendation, the TLC mailed the driver a copy of the recommendation and notified the driver that he or she could submit to the Chairperson a written

response to the recommendation, which could not include any additional evidence outside of the record.  *Id.* at \*10.  But while the Chair reviewed all materials submitted by a driver, the Chair – like the TLC ALJs prior to 2007 – considered only the nexus between the charged crime and public health or safety as an abstract matter, without reference to the individualized characteristics of the suspended driver.  *Id.*

## A.  Procedural History

This long-running case has seen its share of twists and turns, which are familiar enough to the parties and only briefly discussed here.  In 2009, the Court granted the *Nnebe* Defendants' motion for summary judgment, concluding that (1) the TLC did not violate procedural due process by summarily suspending a license without first affording the driver a hearing, (2) the agency's post-suspension hearing also satisfied procedural due process, and (3) Plaintiffs had fair and adequate notice that they faced suspension if arrested for certain crimes.  *Nnebe v. Daus*, 665 F. Supp. 2d 311, 325–26, 330–33 (S.D.N.Y. 2009).  On appeal, the Second Circuit affirmed the Court's finding that the Due Process Clause does not require a pre-suspension hearing.  *Nnebe v. Daus*, 644 F.3d 147, 163 (2d Cir. 2011).  But because the City's representations at oral argument left the panel uncertain about what standard actually applied to suspension decisions, the Second Circuit vacated and remanded for the Court "to conduct additional fact-finding . . . to determine whether the post-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even if the criminal charges are true, continued licensure does not pose any safety concerns."  *Id.* at 161, 163.

In light of the Second Circuit's remand, this Court held a bench trial between January 13 and 21, 2014 to identify the standard applied at post-suspension hearings.  *Nnebe v. Daus*, 184 F. Supp. 3d 54, 59 (S.D.N.Y. 2016).  Consistent with its decision in 2009, the Court found that the

TLC Chair – who retained final decision-making authority over suspensions – considered "only whether (a) the suspended driver has been charged with a crime, (b) the charge is still pending, and (c) there is a nexus between the charged crime, as defined by its statutory elements, and public health or safety." *Nnebe*, 2014 WL 3891343, at *1. Put differently, the Court found that the TLC Chair consistently applied a bright-line rule, deciding suspension cases based on the nature of the criminal offense as opposed to the characteristics of a particular driver.

The Court concluded that this bright-line test did not offend either substantive due process or procedural due process. As to substantive due process, the Court found that the Rule did not infringe a fundamental right, and "that there [wa]s a 'reasonable fit' between the governmental purpose behind the TLC's Rule – that is, protecting the public from dangerous taxi drivers – and the substantive arrest-plus-nexus standard applied by the TLC to advance that purpose." *Nnebe*, 184 F. Supp. 3d at 73.

With respect to procedural due process, the Court framed its analysis around the well-established rule that "procedural due process only requires that the individual be granted an opportunity to prove or disprove facts relevant to the substantive standard selected by the legislature." *Id.* at 65. And as the Court explained, the TLC Rule "expressly states that the 'issue' to be resolved" at a post-suspension hearing is "whether the *charges* underlying the Licensee's arrest, *if true*, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." *Id.* at 66 (quoting 35 R.C.N.Y. § 68–15(d)(3)) (emphasis in original). Based on "[a] plain reading of the Rule," the Court thus concluded that "the entire regulatory scheme turns on whether the *charges* reflect a threat to public health or safety, *not* on whether an individual driver in fact poses a risk to public health or safety." *Id.* (emphasis in original). Accordingly, the Court determined that the

TLC's hearing procedures did not violate procedural due process because "individualized evidence of a driver's dangerousness . . . is simply not relevant under the TLC's statutory scheme." *Id.* at 68.

The Court next considered whether the suspension notices sent to drivers were constitutionally adequate. The Court noted that the Rule was amended in 2006 to include the "nexus" standard outlined above, replacing an earlier version that provided for suspension as necessary to "insure public health, safety or welfare." *See id.* at 58 n.1. The Court found that the notices sent after the 2006 amendment were constitutionally adequate because, although they "d[id] not contain the Rule's substantive standard on their face, they d[id] cite to the operative version of the Rule, which . . . expressly stated the relevant 'issue[s]' to be considered at the summary suspension hearing." *Id.* at 74. But the Court found that the pre-2006 Rule and associated notice did not indicate the "critical issues" to be considered and were therefore constitutionally deficient. *Id.* As a result, the Court scheduled briefing on damages for the pre-2006 notice deprivations, but otherwise entered judgment in favor of the *Nnebe* Defendants.

Because the *Stallworth* Plaintiffs' claims all post-dated the 2006 amendments, the Court granted the *Stallworth* Defendants' motion to dismiss the *Stallworth* action for failure to state a claim in light of the Court's ruling in *Nnebe*. (17-cv-7119, Doc. No. 37.)

Both the *Nnebe* Plaintiffs and the *Stallworth* Plaintiffs appealed, and the Second Circuit heard the cases in tandem. In 2019, the Circuit partially reversed the Court's rulings, concluding that both the Rule and the Code require "a meaningful hearing . . . [that] must give the driver an opportunity to show that his or her *particular* licensure does not cause a threat to public safety." *Nnebe v. Daus*, 931 F.3d 66, 83 (2d Cir. 2019) (emphasis added). Based on this new interpretation of the Rule, which eschewed this Court's "bright line" standard in favor of an individualized one,

7

the Circuit concluded that "given the high risk of erroneous deprivation of the driver's livelihood for a period of months, . . . a hearing that in effect conclusively presumes that suspension is appropriate based solely on the abstract relationship of the elements of a charged offense to safe driving provides inadequate process." *Id.* at 86. It then remanded for this Court to "fashion a constitutionally adequate process," which it emphasized "do[es] not require an inquiry into factual guilt or innocence," but nevertheless must "encompass[] some level of conduct-specific findings based upon the facts underlying the complaint and the driver's history and characteristics." *Id.* at 88.

Finally, while the Circuit affirmed the Court's conclusion that the pre-December 2006 notice was constitutionally inadequate, it found that the post-December 2006 notice was also inadequate. It concluded that although the post-December 2006 notice accurately described the arrest-plus-nexus standard, that "was not what the Rule actually required," thereby leaving drivers "ill-prepared and poorly-informed as to what evidence would be relevant to their hearings." *Id.* at 89.

### B. Developments Since the Second Circuit's 2019 Decision

After the Second Circuit's *Nnebe* decision, the parties engaged in extensive settlement negotiations. On August 28, 2019, this Court referred the case to a magistrate judge for settlement purposes (Doc. No. 427), as requested by Plaintiffs (Doc. No. 426). The parties then requested several extensions to continue the negotiations (Doc. Nos. 435, 439, 441), but after six months, settlement talks proved unproductive (Doc. No. 446).

In the meantime, Defendants began updating their suspension procedures in accordance with the Second Circuit's opinion. Now, when a driver is suspended, the TLC first sends a revised "Notice of License Suspension," which notes that hearing practices have changed because of the

Second Circuit's 2019 decision. (Doc. Nos. 455 at 3 ¶ 6, 455-2 at 1.) The updated notice states that the "purpose of the hearing is not to determine whether [the driver] [is] guilty of the pending criminal charge(s)," but instead to "determine whether the reinstatement of [the driver's] license while criminal charges are pending would pose *a direct and substantial threat to public safety*." (*Id.* at 3 (emphasis in original).) It also explains that at the hearing, the driver can present evidence or testimony to show that he or she is not a threat, which "may relate to the particular circumstances of [the driver's] arrest, [the driver's] TLC driving record, [the driver's] character and standing in the community, or other factors that [the driver] believe[s] show that [he or she] do[es] not pose a direct and substantial threat to public safety." (*Id.*) And if a driver requests a suspension hearing, the TLC then sends an updated "Notice of Hearing," which reiterates the purpose of the hearing and the types of evidence that the driver can introduce. (Doc. Nos. 455 at 3 ¶ 7, 455-4 at 1.)

In addition to using new notices, the TLC recently amended the Rule, adopting several changes that will take effect on January 8, 2021. (Doc. No. 479 at 1.) For starters, the new Rule specifies that the TLC bears the burden of proof to establish that the driver's continued licensure poses a threat to public safety. (*Id.* at 5.) Moreover, much like the updated notices, the new Rule outlines the kinds of evidence relevant to determining whether a driver poses a threat, such as:

(a) The particular facts and circumstances underlying the criminal charges, including the connection between the alleged offense and the [driver's] duties and responsibilities as a driver licensed by the Commission;

(b) The [driver's] driving record, including any history of serious violations or license suspension under these Rules or applicable provisions of law relating to traffic or [v]ehicles licensed by the Commission;

(c) The [driver's] previous criminal record, or lack thereof;

(d) The [driver's] character and standing in the community; and

9

(e) Any other evidence relevant to whether continued licensure . . . during the pendency of criminal charges would pose a direct and substantial threat to public health or safety.

(*Id.*)

The amended Rule also imposes new timeliness requirements for suspension decisions. Specifically, the ALJ must render a recommendation within fifteen business days of the hearing. (*Id.*) If the ALJ recommends lifting the suspension, the Chair must either (1) accept the recommendation within seven days, or (2) notify the driver that the recommendation may be rejected, explain the reasons for possible rejection, and provide the driver with ten days to respond in writing. (*Id.* at 5–6.) If the ALJ recommends continuing the suspension, the Chair must render the final decision within twenty calendar days of receiving the ALJ's recommendation. (*Id.* at 6.) If the Chair does not issue a timely decision, the driver's license suspension is lifted until the Chair makes a final determination. (*Id.* at 5)

The TLC continues to conduct suspension hearings during the COVID-19 pandemic, either by telephone or video. (*See* Doc. No. 455 at 4 ¶ 9.) At each hearing since August 2019, the TLC has introduced evidence about the facts supporting a particular driver's criminal charges, such as the criminal complaint or arrest report. (*Id.* at 2 ¶ 4.) On occasion, the TLC or a driver has introduced documents relating to the driver's driving record, and some drivers have called witnesses to testify to the driver's character and lack of dangerousness. (*Id.*) From the time of the Second Circuit's 2019 *Nnebe* decision until opening briefing, ALJs recommended reinstatement of the driver's license in 14 out of the 19 hearings; in each case where the Chair ruled, it adopted the ALJ's recommendation. (Doc. Nos. 453 at 12, 454-4.)[3] After Plaintiffs filed their opening

---

[3] In some cases, the suspension was lifted before the Chair issued its decision, due to the disposition of the criminal case. *E.g.*, *Taxi & Limousine Comm'n v. Traore*, OATH Index No. 1511/20 (Mar. 4, 2020) (suspension lifted because criminal charges were dismissed).

brief, the Chair reinstated at least ten more drivers based on ALJ recommendations that the TLC failed to prove the driver's dangerousness.

## II.    DISCUSSION

Plaintiffs seek a preliminary injunction enjoining the entire suspension-on-arrest program "at least through the Covid-19 crisis," as well as a permanent injunction consisting of an assortment of reforms aimed at improving the suspension process.    (Doc. No. 453 at 4.)    In response, Defendants argue that any injunctive relief would be moot, given the changes made since the Second Circuit's recent *Nnebe* decision, and that Plaintiffs' proposed relief is unjustified and/or overbroad.    The Court first addresses Defendants' argument that an injunction would be moot, and then turns to Plaintiffs' proposed requests for injunctive relief.

### A.    Mootness

As a threshold issue, the Court must ensure that it has jurisdiction.    It is well established that Article III of the United States Constitution permits federal courts to "hear only 'Cases' or 'Controversies.'"    *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001).    This case-or-controversy requirement demands that the parties' dispute "be real and live . . . throughout the litigation."    *Id.*    In considering whether to issue an injunction, "the moving party must satisfy the court that relief is needed."    *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

Defendants contend that Plaintiffs' "requested injunction is moot" because the TLC has "remedied the constitutional violations identified by the Second Circuit."    (Doc. No. 456 at 11–13.)    But this argument – about what process is due under the Constitution and the Second Circuit's mandate – "confuses mootness with the merits."    *Chafin v. Chafin*, 568 U.S. 165, 174 (2013).    It is not as if Defendants have abandoned the suspension-on-arrest program altogether.    Instead,

Defendants have implemented various procedural changes, which Plaintiffs insist are "inadequate and do[] not comply in full with the Second Circuit's ruling in this case." (Doc. No. 478 at 1.) So the dispute here, at least generally, remains alive and well. *See Chafin*, 568 U.S. at 174–76.

That said, Plaintiffs' request for injunctive relief is moot in one respect. They asked the Court to "order defendants to indicate clearly in the TLC rules that the agency must bear th[e] burden" of proof at the post-suspension hearing. (Doc. No. 453 at 19.) The updated TLC Rule explicitly places the burden of proof on the TLC to show that continued licensure poses a direct and substantial threat to the public. (Doc. 479 at 5.) Having received the "precise relief" sought, Plaintiffs' request for an order regarding the burden of proof is now moot. *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020). In all other respects, however, the parties have a real dispute about what the law requires of Defendants. *See Chafin*, 568 U.S. at 174.

### B. Injunctive Relief

Plaintiffs seek both preliminary and permanent injunctive relief. A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must at least establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

The standard for a permanent injunction is comparable to that of a preliminary injunction, except that Plaintiffs must show actual success on the merits. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). In ordering such injunctive relief after "local authorities 'fail in their affirmative obligations' under

federal law, 'the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies.'" *Disabled in Action v. Bd. of Elections of New York*, 752 F.3d 189, 198 (2d Cir. 2014) (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).  At the same time, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990).  So the Court must carefully "tailor the remedy to fit the nature and extent of the violation." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1235 (2d Cir. 1987).

### 1.  Preliminary Injunction

Plaintiffs request a preliminary injunction ordering the TLC to "cease its suspension-on-arrest program at least as to misdemeanor and non-violent felony arrests" throughout the COVID-19 pandemic, or until the Court has entered, and Defendants have implemented, a permanent injunction with various reforms.  (Doc. No. 453 at 18.)  Such drastic relief is certainly not warranted.

While the Circuit has emphasized that the private interest here is "extremely strong," as "most taxi drivers rely on the job as their primary source of income," *Nnebe*, 931 F.3d at 83–84 (quoting *Nnebe*, 644 F.3d at 159), it also has highlighted the "'significant interest' that the government has 'in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility,'" *id.* at 85 (quoting *Gilbert v. Homar*, 520 U.S. 924, 932 (1997)).  Indeed, the Circuit has repeatedly underscored that "among the most critical functions performed by the TLC are ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis, and thus . . . an arrest for a felony

or serious misdemeanor creates a strong government interest in ensuring that the public is protected in the short term, prior to any hearing." *Id.* at 85–86 (internal quotation marks omitted).

Clearly, the cessation of suspensions altogether is not appropriate. To start, the relief fails to account for the government's "significant interest" in immediate suspension, *id.* at 85; that interest is not on a hiatus during the COVID-19 pandemic. Importantly, Plaintiffs do not contest that the TLC has continued to hold suspension hearings within ten days of a driver's request – even during the pandemic. (Doc. No. 453 at 18.) Nor have they demonstrated that the pandemic has otherwise slowed the processing of suspension cases. (*Id.*) Plaintiffs have instead focused on delays COVID-19 has caused in New York state courts (*id.*), but those delays contrast sharply with the TLC's undeterred processing of suspensions. Having offered no persuasive justification for such a cessation, Plaintiffs have failed to demonstrate irreparable harm, a likelihood of success on the merits, or that the public interest would be served. Accordingly, the Court has little difficulty in denying Plaintiffs' motion for a preliminary injunction.

### 2. Permanent Injunction

As to a permanent injunction, Plaintiffs seek a laundry list of long-term reforms, asking for an order that would, among other things, (1) modify the TLC's pre-hearing notices; (2) mandate that ALJs and the TLC Chair consider ten non-exhaustive factors, along with a risk-assessment score, when deciding whether to lift a suspension; (3) eliminate or limit Chair review; (4) require automatic scheduling of post-suspension hearings; (5) command that suspension decisions omit a driver's name; (6) direct the TLC to collect and publish statistics about the number of hearings and suspensions; and (7) shorten the timeframe for the TLC's processing of a driver's suspension. (Doc. No. 453 at 3, 18, 19.) Taking each request in turn, the Court finds that only the last one calls for a permanent injunction.

14

a. The TLC's Pre-Hearing Notices

The Court first considers the adequacy of the TLC's notices. To be effective, notice must be "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Adequate notice must inform a driver about the "critical issue" to be determined at the suspension hearing, *see Turner v. Rogers*, 564 U.S. 431, 447 (2011), so as "to give the charged party a chance to marshal the facts in his defense," *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974). *See Spinelli v. City of New York*, 579 F.3d 160, 172 (2d Cir. 2009) (noting that failure to "reasonably . . . convey the required information that would permit [a party] to present [his or her] objections" amounts to inadequate notice (internal quotation marks omitted)).

The crux of the Circuit's finding in *Nnebe* regarding the post-2006 notice was that the standard in the TLC's pre-hearing notices "was not what the Rule actually required," thus leaving drivers "ill-prepared and poorly informed as to what evidence would be relevant to the hearings thereafter." 931 F.3d at 89. But the current notices, while not "a roadmap to a successful defense," *id.* at 88, no longer leave drivers in the dark. Rather, in language clearly communicating the requirements set out by the Second Circuit, the updated notice informs the driver that the purpose of the hearing is to "determine whether the reinstatement of [the driver's] license while criminal charges are pending would pose *a direct and substantial threat to public safety*," and further instructs that the driver may present evidence relevant to this standard – including evidence about "the particular circumstances" of the driver's arrest, the driver's "TLC driving record," and the driver's "character and standing in the community." (Doc. No. 455-2 at 3 (emphasis in original)); *see also Nnebe*, 931 F.3d at 83 ("[A] meaningful hearing . . . must give the driver an opportunity to show that his or her particular licensure does not cause a threat to public safety."); *id.* at 88 ("[A]

15

hearing that encompasses some level of conduct-specific findings based upon the facts underlying the complaint and the driver's history and characteristics . . . would be sufficient."). These updated notices have therefore remedied the Circuit's concerns.[4] The additional information sought by Plaintiffs is therefore not necessary to meet the constitutional requirements of due process.

b. <u>Evidence To Be Considered by ALJs and the TLC Chair</u>

Plaintiffs next request that the Court order the TLC to implement a rule requiring the ALJ and Chair to weigh ten non-exhaustive factors when assessing whether to continue suspension of a driver's license:

> (1) whether the driver was issued a desk appearance ticket at the time of his arrest or was released without bail at arraignment; (2) whether or not the driver has any prior convictions; (3) whether the driver has ever been convicted by the TLC tribunal of assaulting or threatening a passenger; (4) whether the driver has been suspended previously for violating a TLC rule; (5) the number of years the driver has been licensed; (6) the driver's overall TLC record; (7) the driver's age and maturity (such as whether he supports a family); (8) [t]he facts and circumstances surrounding the arrest; (9) whether there are mitigating factors as to the alleged offense; and (10) whether the alleged offense occurred while the driver was on-duty and involved a passenger or TLC official.

(Doc. No. 453 at 21–22.) But the Second Circuit did not mandate that Defendants create a checklist of specific factors. To the contrary, it explicitly stated that "a hearing that encompasses some level of conduct-specific findings based upon the facts underlying the complaint and the driver's history and characteristics . . . would be sufficient" to satisfy due process. *Nnebe*, 931 F.3d at 88.

---

[4] Plaintiffs also argue in a footnote that there should be no suspensions until one to three days *after* notice has been sent. (Doc. No. 453 at 25 n.19.) But the Second Circuit has already confirmed that "the City is not required to grant a driver a hearing before suspending his license because of an arrest," as "an arrest for a felony or serious misdemeanor creates a strong government interest in ensuring that the public is protected in the short term, prior to any hearing." *Nnebe*, 644 F.3d at 158–59. In so holding, the Circuit did not call into question the fact that a suspension could be put in place before written notice was provided to drivers. Regardless, since Defendants now notify drivers by email, as well as by mail, the Court finds that there is little risk of a significant delay between suspension and written notification. (Doc. No. 455 at 5–6.)

The TLC's amended Rule fits the bill. It describes the evidence that may be introduced at a hearing – including about the "particular facts and circumstances underlying the criminal charges," the driver's criminal and driving record, and the driver's "character and standing in the community." (Doc. No. 479 at 5.) Plaintiffs' ten-factor test is derived from those general categories, and in fact, Plaintiffs' list of factors is largely drawn from recent OATH opinions that already apply the Second Circuit's most recent *Nnebe* decision. (Doc. No. 453 at 21–22.) There is simply no need for a course correction here.

The Court likewise refuses to order the TLC to use a risk assessment tool like the Pretrial Risk Assessment ("PTRA") employed by some criminal courts in making bail determinations. Whatever the benefits of such an algorithmic system, the Court's job is "to fashion a constitutionally adequate process," *Nnebe*, 931 F.3d at 88, not to impose an administrative scheme according to Plaintiffs' specifications. Interestingly, Plaintiffs themselves only go so far as to say that the remedy "could" be helpful; they do not assert that it is constitutionally required. (*See, e.g.*, Doc. No. 453 at 20 ("[A] PTRA score *could be* used to guide ALJs and the chair . . . ." (emphasis added)), 20–21 ("A PTRA score would be a good reference point for ALJs . . . .").) Moreover, it bears noting that the federal bail statute, which has been upheld as constitutionally sound on numerous occasions, *see, e.g.*, *United States v. Salerno*, 481 U.S. 739 (1987); *United States v. Berrios-Berrios*, 791 F.2d 246, 252 (2d Cir. 1986), neither mentions nor compels the use of a PTRA-like metric. Accordingly, the Court finds absolutely no basis to conclude that a PTRA score must be part of a "constitutionally adequate process." *Nnebe*, 931 F.3d at 88.

c. Eliminating or Restricting Chair Review

In addition, Plaintiffs seek to abolish, or at least limit, Chair review of ALJ suspension recommendations. (Doc. No. 453 at 22–23.) But this demand is clearly beyond the Second

Circuit's mandate, which at no point questioned the validity of the Chair's role. Moreover, while Plaintiffs surmise that Chair review "could be entirely arbitrary" (*id.* at 23), they have provided no evidence supporting this contention. Indeed, the evidence since the Circuit's most recent *Nnebe* decision suggests just the opposite. Even Plaintiffs note that, at the time of briefing, the Chair had issued a ruling in nine cases, each time accepting the ALJ's recommendation, and six times reinstating a driver's license. (*Id.* at 12; Doc. No. 454-4.) And in the weeks since Plaintiffs submitted their opening brief, it appears that the Chair has reinstated at least ten more drivers based on ALJ recommendations that the TLC failed to establish that the driver was dangerous under the Second Circuit's *Nnebe* standard.[5] The Court has no reason to suspect that this trend will end, especially because the TLC's new Rule further limits the potential for arbitrariness by specifying that the Chair "may not reject or modify the [ALJ's] Recommended Decision without setting forth a reasonable basis for doing so." (Doc. No. 479 at 5–6.) Thus, although the amended Rule does not go so far as to eliminate the Chair's role altogether or, in the alternative, limit the Chair's ability to reject an ALJ recommendation unless it is "clearly erroneous" or "plainly unsupported by the evidence," as requested by Plaintiffs (*see* Doc. No. 453 at 23), it does sufficiently constrain the Chair's discretion and ensure that the Chair's rulings are not arbitrary.[6]

---

[5] *Taxi & Limousine Comm'n v. Feliz Ruiz*, OATH Index No. 0045/21 (Aug. 11, 2020), *recommendation adopted* (Aug. 12, 2020); *Taxi & Limousine Comm'n v. Ayala-Casado*, OATH Index No. 2236/20 (July 16, 2020), *recommendation adopted* (July 31, 2020); *Taxi & Limousine Comm'n v. Islam*, OATH Index No. 2085/20 (July 6, 2020), *recommendation adopted* (July 8, 2020); *Taxi & Limousine Comm'n v. Mota*, OATH Index No. 2010/20 (June 17, 2020), *recommendation adopted* (June 29, 2020); *Taxi & Limousine Comm'n v. Askari*, OATH Index No. 1960/20 (June 16, 2020), *recommendation adopted* (June 22, 2020); *Taxi & Limousine Comm'n v. King*, OATH Index No. 2043/20 (June 9, 2020) *recommendation adopted* (June 22, 2020); *Taxi & Limousine Comm'n v. Bah*, OATH Index No. 1927/20 (June 1, 2020), *recommendation adopted* (June 9, 2020); *Taxi & Limousine Comm'n v. Balbuena*, OATH Index No. 1975/20 (May 15, 2020), *recommendation adopted* (May 29, 2020); *Taxi & Limousine Comm'n v. Singh*, OATH Index No. 1913/20 (Apr. 24, 2020), *recommendation adopted* (May 1, 2020); *Taxi & Limousine Comm'n v. Zulfiqar*, OATH Index No. 1575/20 (Mar. 16, 2020), *recommendation adopted* (Apr. 13, 2020).

[6] Plaintiffs offer an additional basis for eliminating the Chair's role in the suspension process, noting that

d. Automatic Scheduling of Suspension Hearings

Plaintiffs next contend that the TLC should be compelled to schedule a hearing automatically, whether or not the driver has requested such a hearing. (Doc. No. 453 at 25–26.) But again, such a remedy is not remotely compelled by Second Circuit's 2019 *Nnebe* decision or any other binding precedent. The Supreme Court, in fact, upheld a comparable federal law in *Federal Deposit Insurance Corp. v. Mallen*, concluding that a suspended banker had a meaningful opportunity to challenge his suspension where the agency was required to conduct a hearing within thirty days of the banker's request. 486 U.S. 230, 242, 246–47 (1988). In reaching this conclusion, the Supreme Court in no way cast doubt on the constitutionality of placing on a property owner the de minimis burden of requesting a hearing.

Equally instructive is the Second Circuit's decision in *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) – a case relied upon by Plaintiffs and cited by the Circuit in *Nnebe*. In *Krimstock*, the Second Circuit held that vehicle owners whose cars had been seized as instrumentalities of a crime were entitled to a prompt post-deprivation hearing to challenge the seizure. *Id.* at 44. But rather than order *automatic scheduling* of post-seizure hearings, the court simply "order[ed] that claimants be given a prompt post-seizure retention hearing, with adequate notice, for motor vehicles seized as instrumentalities of crime." *Id.* at 68–69. If due process required *automatic*

---

because the TLC "both initiated the suspensions and was the ultimate adjudicator, the TLC chair [is, impermissibly,] a judge in his own case." (Doc. No. 453 at 23.) According to Plaintiffs, "[u]nder New York law, serving as both prosecutor and adjudicator presents at minimum an appearance of unfairness or impartiality that requires recusal." *Id.* (citing *General Motors Corp.-Delco Prods. Div. v. Rosa*, 82 N.Y.2d 183, 188 (1993); *Beer Garden v. N.Y. State Lis. Auth.*, 79 N.Y.2d 266, 278 (1992)). But the cases cited by Plaintiffs are inapposite, and concern a *specific individual's* conflict of interest in serving both as a prosecutor and an adjudicator. The law of this Circuit is clear that "when it is the same office – rather than the same person – that performs multiple functions, due process is not violated." *Karpova v. Snow*, 497 F.3d 262, 271 (2d Cir. 2007).

scheduling, one would have expected the Second Circuit to have said as much.  The Court instead

commented favorably on a voucher that notified claimants of procedures they should follow "for

demanding the return of property," and suggested that "[a]dequate notice of the right to a post-

seizure retention hearing could readily be added to this information."  *Id.* at 68 n.31.

Understandably, the district court on remand placed on a claimant the minimal burden of

requesting a hearing.  *Krimstock v. Kelly*, 99-cv-12041 (HB), 2007 U.S. Dist. LEXIS 82612, at

*5–6 (S.D.N.Y. Sep. 27, 2007).

At bottom, while due process mandates that each driver be provided with a "real

opportunity" to be heard, *Nnebe*, 931 F.3d at 91, it does not require the automatic scheduling of a

hearing for a driver who has not requested one.[7]

### e. Suspension Decisions Naming Drivers

Plaintiffs further request that each suspension decision omit a driver's name.  Until now,

this asserted need for anonymity has never been pressed in this fourteen-year litigation.  (Doc. No.

455 at 10 ¶ 27.)  And even now, Plaintiffs do not ground their argument in the law, except in

commenting that the lack of anonymity "violates at least the spirit of NY Criminal Procedure Law

---

[7] Plaintiffs also insist that automatic scheduling of hearings is necessary because the vast majority of drivers have not requested hearings even after the Second Circuit's decision in *Nnebe.*  But the fact that relatively few drivers request a hearing hardly compels the conclusion that the TLC's suspension procedures are constitutionally flawed.  Indeed, by that reasoning, the fact that more than 90% of federal criminal defendants plead guilty before trial, *see* United States Courts, *Criminal Cases*, https://www.uscourts.gov/about-federal-courts/types-cases/criminal-cases (last visited Dec. 28, 2020), would imply a constitutional defect in our entire criminal justice system.  Not surprisingly, no court has ever held as much, and any such holding would be difficult to square with the Supreme Court's repeated affirmation of plea bargaining, *see, e.g.*, *United States v. Mezzanatto*, 513 U.S. 196, 209–10 (1995); *Corbitt v. New Jersey*, 439 U.S. 212, 219 (1978).  In truth, there are numerous legitimate reasons why a driver might forgo his or her right to a suspension hearing, including, most obviously, the fact that statements made during the hearing could be used against the driver in his or her ongoing criminal case.  *See United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." (citing Fed. R. Evid. 801(d)(2)(A)).

§ 160-50, which generally requires that arrest records be sealed after the criminal action is terminated in favor of the accused."  (Doc. No. 453 at 26.)  But to state the obvious, § 160-50 requires sealing only *after* a favorable disposition to the criminal defendant.  Prior to that, the presumption of open records compels public access to all but a select handful of criminal filings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984); *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986).  Since the charged drivers are publicly named in their criminal proceedings upon arrest, the anonymous filing of suspension papers would achieve little.  It also bears noting that the presumption of open records applies generally to civil proceedings, *see Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 21–23 (2d Cir. 1984), and to administrative proceedings, *see NYCLU v. NYCTA*, 675 F. Supp. 2d 411, 437 (S.D.N.Y. 2009) (Sullivan, *J.*) (finding a qualified First Amendment right of access to New York City Transit Adjudication Bureau hearings), *aff'd* 684 F.3d 286 (2d Cir. 2012).

In any event, Plaintiffs have not established that Defendants have violated § 160-50.  "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *People v. Anonymous*, 34 N.Y.3d 631, 636 (2020) (internal quotation marks omitted).  Plaintiffs bypass any textual analysis, and in doing so, they overlook that § 160-50 does not bind every government agency to seal records of the accused:  rather, when the trial court seals the criminal record, the clerk of court generally must "notify the commissioner of the division of criminal justice services and the heads of all appropriate police departments and other law enforcement agencies . . . that the record of such action or proceeding shall be sealed."  N.Y. Crim. Proc. § 160-50(1).  Plaintiffs' undeveloped argument lacks any allegation that the TLC is a law enforcement

agency bound by the sealing statute, that the TLC receives notice of its alleged obligation to seal

a driver's records, or that the TLC neglects this obligation after it has been notified.  (Doc. No.

454-6 at 2 ¶ 6.)  And in at least one case, OATH redacted the name of a driver who requested

sealing after his criminal charges were dismissed.  (Doc. No. 455-6 at 1 n.1.)  Accordingly,

Plaintiffs have failed to demonstrate that the TLC has an obligation to redact names, much less

that it has fallen short of its alleged duty.

### f. Collecting and Publishing Statistics

Plaintiffs also argue that the Court should compel Defendants to "issue periodic reports

concerning the number of suspensions, the number of hearings, and the number of reinstatements."

(Doc. No. 453 at 27.)  But while the issuance of such reports might be consistent with good

governance and administrative transparency, Plaintiffs offer no legal support for the proposition

that such reporting is a prerequisite for procedural due process.  Moreover, the information sought

by Plaintiffs is already generally available under New York's Freedom of Information Law, as

demonstrated by Plaintiffs' use of the law to obtain the statistics cited in this lawsuit.  (Doc. Nos.

454-1, 454-2.)  OATH also issues monthly updates on its website that summarize and provide links

to recent licensing decisions.[8]  Accordingly, the Court declines Plaintiffs' request for judicial

invention that goes far beyond the requirements of due process and the Circuit's ruling in *Nnebe*.

### g. Timeframe for Suspension Decisions

Finally, Plaintiffs ask the Court to impose a series of reforms to ensure that suspension

cases will be adjudicated faster than the updated Rule requires.  Specifically, Plaintiffs argue that

"ALJs should be encouraged to rule from the bench," that Chair review should be eliminated, and

---

[8]  *See* Off. of Admin. Trials & Hearings, *OATH Recent Decisions and News*, https://www1.nyc.gov/site/oath/trials/decisions.page (last visited Dec. 29, 2020).

that each decision should be rendered within fewer days. (Doc. No. 453 at 24–25.) The Court rejects the first two proposals, but agrees that the timeline for making decisions should be tightened and accelerated.

First, the Court easily dismisses Plaintiffs' contention that the Court should issue an injunction "encourag[ing]" ALJs to rule from the bench. (*Id.* at 24.) Such a ruling is clearly not required by the Second Circuit's opinion. And while the Court certainly has no objection to ALJs ruling from the bench, it will not impose an amorphous order "encouraging" as much, which would be difficult – if not impossible – to enforce.

Second, while the elimination of Chair review would undoubtedly streamline the review process, the Court declines to abolish or otherwise limit Chair review for the reasons stated above. Nor is the Court moved by Plaintiffs' unsupported suggestion that, even if the Chair remained, ALJ recommendations should take immediate effect, only to be overturned if the Chair later disagrees with the recommendation. (*Id.* at 25.) Although the Court is obligated "to fashion a constitutionally adequate process" *Nnebe*, 931 F.3d at 88, it must nevertheless take care to avoid unnecessary tinkering with the local government's rules, *see Jenkins*, 495 U.S. at 51. Plaintiffs' proposed alteration is less about increasing the speed of adjudications than it is about diminishing the role of the TLC Chair in the license suspension process. But such a modification is neither compelled nor suggested by the Second Circuit's decision in *Nnebe.*

The Court nonetheless agrees with Plaintiffs that the timeline for adjudications set forth in the new Rule must be compressed to ensure a speedier resolution of the hearing process. After all, "a lengthy deprivation of property, based on an arrest without a judicial determination of probable cause and without a deeper inquiry into whether the deprivation is appropriate, violates the Constitution's guarantee of procedural due process." *Nnebe*, 931 F.3d at 87. To be sure, the

timeline for processing a driver's claim will improve under the TLC's updated Rule.  Before the amendment, an adjudicatory determination had to be made within sixty days of the date of the close of a hearing.  *See* N.Y.C. Admin. Code § 19-512.1(a).  Now, however, ALJs must issue their recommendation within fifteen business days after the close of the hearing, and the Chairperson must then accept, reject, or modify that recommendation within twenty days.  (Doc. No. 479 at 5–6.)  If the Chairperson fails to do so, "the suspension must be lifted until such action is taken by the Chairperson."  (*Id.* at 6.)  The new Rule also provides for expedited Chair review should the ALJ recommend that the suspension be lifted:  In that case, the Chairperson must, within *seven* days, "(i) accept the recommendation and lift the suspension, or (ii) provide the Respondent notice that the Recommended Decision may be rejected or modified, and the reasons therefor, and ten (10) days to respond in writing to such notice."  (*Id.*)  But this process still means that drivers might wait more than thirty-five days after their hearing – or more than forty-five days after their suspension – before a final determination is reached.  That is too long.  *See Nnebe*, 931 F.3d at 87 (expressing concern that "a taxi-driver's license can be suspended without any independent determination of probable cause, and the deprivation could last weeks or months").

So what timeline is required?  In their opening brief, Plaintiffs did not propose a specific timeframe, but did cite to the district court's order following remand in *Krimstock*.  *See Krimstock*, 2007 U.S. Dist. LEXIS 82612, at *3 (mandating that an OATH judge issue its findings "not later than three business days following the close of evidence and the completion of argument, if any, at the hearing").  In their reply brief, however, Plaintiffs appeared to suggest that the ALJ process should "normally" take twenty days – "10 days to schedule a hearing plus 10 days for the ALJ to rule" – and that Chair review (if it is not abolished) should be completed within five business days.

(Doc. No. 457 at 9–10.)  Then, during the oral argument, Plaintiffs again suggested the three-day rule in *Krimstock* should serve as a guide.

While informative, *Krimstock* did not impose a template for all adjudicatory proceedings. Additional time is warranted here since the ALJ must conduct an individualized assessment into the context of the driver's crime, as well as his or her criminal history, past TLC rule violations, and present standing in the community.  By contrast, the crux of the Court's inquiry in *Krimstock* was whether there was probable cause to seize an individual's vehicle after an arrest – and "the City's burden of proving probable cause in [driving while intoxicated] cases" like the ones at issue in *Krimstock* "is not onerous."  *Krimstock*, 306 F.3d at 50, 53.

On balance, the Court concludes that the timeline in Plaintiffs' reply brief is appropriate. The Court finds that a turnaround of ten business days for ALJ recommendations would not place an overwhelming burden on the City, and would permit sufficient time for careful adjudication. The Court also agrees that the Chair does not need more than five business days to render a final determination because Chair review benefits from a closed record, along with the recommendation and analysis of a neutral ALJ.  The Court sees no need to eliminate the opportunity provided by the amended TLC Rule for drivers to respond if either the ALJ recommends leaving the suspension in place or if the Chair is inclined to reject the ALJ's recommendation to lift the suspension. Accordingly, the Court finds the following timeframe to accord with the requirements of due process and the Second Circuit's mandate:

- ALJs must submit their recommendation within ten business days of the suspension hearing.

- If the ALJ recommends lifting the suspension, the Chair must

  o "accept the recommendation and lift the suspension" within five business days (Doc. No. 479 at 6), or

       o  notify the driver within five business days that the recommendation "may be rejected or modified, and the reasons therefor." (*Id.*) The driver will then have up to ten calendar days to respond (*id.*), and the Chair shall render a final decision within five business days of receiving the driver's response.

- If the ALJ recommends maintaining the suspension, the driver must be promptly notified and be afforded up to ten calendar days to respond. The Chair's final decision must be rendered within five business days of receiving the driver's response.

If the ALJ or Chair fails to meet these deadlines, the suspension shall immediately be lifted until a final determination is rendered.

### III.   CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Plaintiffs' motion for a preliminary injunction is DENIED. IT IS FURTHER ORDERED THAT Plaintiffs' motion for permanent injunction is GRANTED in part, such that Defendants shall modify the timeframe for rendering suspension decisions in accordance with this Opinion and Order, and DENIED as to the remainder of Plaintiffs' requests. The Clerk of Court is respectfully directed to terminate the motion at 06-cv-4991, Doc. No. 452 and 17-cv-7119, Doc. No. 70.

SO ORDERED.

Dated:      December 31, 2020
            New York, New York

                                         RICHARD J. SULLIVAN
                                         UNITED STATES CIRCUIT JUDGE
                                         Sitting by Designation